IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
May 11, 2021 Session

IN RE **KIERANI C.**

Appeal from the Circuit Court for Shelby County
Nos. CT-002116-18, CT-004063-18          Gina C. Higgins,  Judge

_____

No. W2020-00850-COA-R3-PT
_____

This is a termination of parental rights case focusing on Kierani C., the minor child ("the Child") of Christopher A., Sr. ("Father"), and Keona C. ("Mother").  In August 2017, Mother surrendered her parental rights to the Child before the Shelby County Chancery Court ("chancery court").[1]  At that time, the Child was placed in the legal custody and partial guardianship of Hannah's Hope United Methodist Adoption and Pregnancy Counseling ("Hannah's Hope") and the physical custody of pre-adoptive parents, Katherine B. and Adrian B.  In September 2017, Hannah's Hope filed a petition in the chancery court to terminate Father's parental rights to the Child.  In January 2018, Father filed a petition to establish parentage in the Memphis and Shelby County Juvenile Court ("juvenile court"), and in May 2018, Katherine B. and Adrian B. filed a petition in the Shelby County Circuit Court ("trial court") to terminate Father's parental rights to the Child.  Upon motions filed by Katherine B. and Adrian B., all matters pertaining to the Child were subsequently transferred to the trial court, which consolidated the actions. Following a bench trial, the trial court granted both termination petitions upon its finding clear and convincing evidence of ten statutory grounds, including four abandonment grounds, specifically that Father had willfully failed to (1) visit the Child in the four months preceding the petition's filing by Hannah's Hope, (2) financially support the Child in the four months preceding each petition's filing, (3) visit Mother during the four months preceding the Child's birth, and (4) make reasonable payments toward Mother's financial support during the four months preceding the Child's birth, as well as six grounds applicable to a putative father, specifically that Father had failed to (5) pay a reasonable share of expenses related to the Child's birth, (6) make reasonable and consistent payments for the Child's support, (7) seek reasonable visitation with the Child, (8) file a petition to establish paternity within thirty days of receiving notice of alleged paternity, and (9) manifest an ability and willingness to assume legal and physical custody of the Child, and, additionally, that (10) placement of the Child in Father's legal and physical custody would pose a risk of substantial harm to the Child's welfare.  The

---

[1] The surrender of Mother's parental rights to the Child is not at issue on appeal.  We will therefore confine our analysis to those facts relevant to Father's appeal.

trial court further found by clear and convincing evidence that it was in the Child's best interest to terminate Father's parental rights. Father has appealed. We hold that under Tennessee Code Annotated § 36-1-113(g)(9)(A)(ii) and (iii), a putative father's efforts made after the termination petition's filing may be considered in reviewing the respective grounds involving failure to support the child and failure to seek or maintain visitation with the child. Therefore, having determined that clear and convincing evidence did not support the trial court's findings that Father's efforts to support and visit the Child made after the respective petitions' filings were unreasonable or token, we reverse the trial court's findings as to these two grounds. We affirm the trial court's judgment terminating Father's parental rights in all other respects.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed in Part, Reversed in Part; Case Remanded**

THOMAS R. FRIERSON, II, J., delivered the opinion of the court, in which J. STEVEN STAFFORD, P.J., W.S., and ARNOLD B. GOLDIN, J., joined.

Shantell S. Suttle, Cordova, Tennessee, for the appellant, Christopher A., Sr.

Laura D. Rogers, Memphis, Tennessee, for the appellees, Katherine B. and Adrian B.

Kevin W. Weaver, Cordova, Tennessee, for the appellee, Hannah's Hope United Methodist Adoption and Pregnancy Counseling.

**OPINION**

I. Factual and Procedural Background

Father and Mother were never married and never resided together. Undisputed trial testimony demonstrated that at the time the Child was conceived, Mother was seventeen years of age, Father was forty years of age, and their intimate encounter included another one of Father's girlfriends, M.P. Mother informed Father of her pregnancy and his alleged paternity in June 2016. During Mother's pregnancy, Father purchased prenatal vitamins and some food items for her in September 2016, and testimony demonstrated that she stayed one night with him at that time. The Child was born in January 2017, and Mother informed Father of the birth in February 2017. Father's first visit with the Child and his only one while the Child remained in Mother's custody occurred when he met Mother and the Child at a park in May 2017 and presented the Child with a pair of oversized shoes.

On August 30, 2017, Mother appeared before the chancery court and surrendered her parental rights to the Child. The chancery court concomitantly granted a partial order of guardianship to Hannah's Hope. The Child previously had been placed in the physical custody of Katherine B. and Adrian B. on August 27, 2017.

Hannah's Hope filed its petition for termination of Father's parental rights in the chancery court on September 19, 2017 ("First Petition"), alleging two grounds of statutory abandonment, specifically that in the four months preceding the petition's filing, Father had willfully failed to (1) visit the Child and (2) financially support the Child. *See* Tenn. Code Ann. § 36-1-102(1)(A)(i) (2017). Hannah's Hope alleged an additional four statutory grounds applicable to a putative father, specifically that Father had failed to (3) make reasonable and consistent payments for the support of the Child; (4) seek reasonable visitation with the Child; (5) manifest an ability and willingness to assume legal and physical custody of the Child, and (6) file a petition to establish paternity within thirty days of receiving notice of alleged paternity. *See* Tenn. Code Ann. § 36-1-113(g)(9)(A)(ii), (iii), (iv), (vi) (2017). Hannah's Hope further alleged that termination of Father's parental rights was in the Child's best interest.

Father, acting without benefit of counsel and in concert with the Child's maternal grandmother ("Maternal Grandmother"), filed an answer objecting to the termination of his parental rights on October 25, 2017. A "DNA Test Report," dated July 25, 2017, appears in the record immediately following Father's answer, reflecting that Father was the biological parent of the Child. The chancery court subsequently appointed Father's counsel to represent him and appointed attorney Constance W. Alexander as guardian *ad litem* ("GAL") to represent the Child's best interest. On December 20, 2017, Father filed a "Petition for Custody and/or Visitation" in the chancery court, naming Hannah's Hope as a respondent and alleging that Hannah's Hope had not allowed him to visit the Child. Following a hearing, the chancery court entered an order on February 16, 2018, granting to Father nine hours of weekly visitation with the Child to be supervised by Hannah's Hope at the organization's facility. The chancery court required Father to "notify [Hannah's Hope], particularly [Executive Director] Reverend Trina Morrison, of his desire to visit with the child via phone by the Friday before the following Tuesdays-Thursdays of which days and times that he would like visitation time with his child . . . ."

On February 20, 2018, Hannah's Hope filed in the chancery court a motion to stay visitation concomitantly with a motion for permission to file a Tennessee Rule of Appellate Procedure 9 interlocutory appeal. Asserting Father's status as a putative father, Hannah's Hope argued that "[t]here is a need to review whether it is in the child's best interest for visitation so as to prevent any irreparable injury to the child relating to her development" and that appellate review months after visitation had been granted would be "ineffective." Following a hearing conducted on February 23, 2018, the chancery

court rendered an oral ruling denying the motion to stay visitation, which it subsequently memorialized in a written order on March 1, 2018. On February 26, 2018, Hannah's Hope filed a Tennessee Rule of Appellate Procedure 10 motion for extraordinary appeal with this Court together with a motion for "Emergency Stay of Interlocutory Visitation Order." In an order entered February 28, 2018, and subsequently superseded by an order entered the next day, this Court granted the motion for an emergency stay but directed Father and the GAL to file responses within fourteen days. Upon these responses, this Court entered an order on March 29, 2018, denying Hannah's Hope's Rule 10 application for extraordinary appeal and vacating the stay of the chancery court's visitation order.

Katherine B. and Adrian B. (hereinafter, "Petitioners") filed their petition to terminate Father's parental rights to the Child in the trial court on May 7, 2018 ("Second Petition"). Although Petitioners named both Father and Hannah's Hope as respondents, Hannah's Hope appears to have been named solely in its status as a legal guardian to the Child. As to Father, Petitioners alleged three grounds of statutory abandonment, specifically that Father had willfully failed to (1) financially support the Child in the four months preceding the petition's filing, (2) visit Mother during the four months preceding the Child's birth, and (3) make reasonable payments toward Mother's financial support during the four months preceding the Child's birth. *See* Tenn. Code Ann. § 36-1-102(1)(A)(i), (iii) (2017). Petitioners also alleged five grounds applicable to a putative father, specifically that Father had failed to (4) pay a reasonable share of prenatal, natal, and postnatal expenses involving the Child's birth; (5) make reasonable and consistent payments for the support of the Child; (6) manifest an ability and willingness to assume legal and physical custody of the Child; and (7) file a petition to establish paternity within thirty days of receiving notice of alleged paternity, *see* Tenn. Code Ann. § 36-1-113(g)(9)(A)(i), (ii), (iv), (vi) (2017); and (8) that placement of the Child in Father's legal and physical custody would pose a risk of substantial harm to the welfare of the Child, *see* Tenn. Code Ann. § 36-1-113(g)(9)(A)(v) (2017). Petitioners further alleged a ninth statutory ground of a "legal parent or guardian" having failed to manifest an ability and willingness to personally assume legal and physical custody or financial responsibility for the Child, *see* Tenn. Code Ann. § 36-1-113(g)(14) (2017), and they alleged that termination of Father's parental rights was in the best interest of the Child.

Referring to themselves in the Second Petition as "Presumptive Adoptive Parents," Petitioners requested that upon termination of Father's parental rights, they be allowed to adopt the Child and that the Child's name be legally changed to reflect their surname. Petitioners also requested that the trial court suspend "any visitation" between Father and the Child. Having requested in the Second Petition that the First Petition be transferred from the chancery court to the trial court, Petitioners subsequently filed a motion for transfer in the chancery court. Father filed an objection to the transfer of the First Petition in the chancery court while also filing pleadings in the circuit court

- 4 -

requesting a transfer of the Second petition to the chancery court, which Petitioners opposed. Following a hearing, the chancery court ultimately entered an order on August 31, 2018, transferring the First Petition from the chancery court to the trial court upon determining, pursuant to Tennessee Code Annotated § 36-1-116(f)(1) (Supp. 2020), that the circuit court had acquired exclusive jurisdiction with the filing of an adoption petition.

Meanwhile, Petitioners filed a motion for default judgment in the trial court on June 22, 2018, and Father filed several responsive pleadings in the trial court on July 12, 2018. Father also filed a response to the Second Petition, admitting that he had not filed a petition to establish paternity within thirty days of notice of alleged paternity but denying all other substantive allegations against him. Father raised "affirmative defenses," including, *inter alia*, that he had a bond with the Child; he was willing and able to assume custody of the Child; Petitioners had "unclean hands" because they had interfered with Father's ability to have contact with the Child; termination of Father's parental rights was not in the best interest of the Child; and Father had "provided gifts, clothing, and child support" for the Child through Hannah's Hope. Father also alleged that Petitioners lacked standing due to the First Petition's prior filing in the chancery court and that the Second Petition failed to state a claim upon which relief could be granted. Father concomitantly filed, *inter alia*, a response opposing Petitioners' motion for default judgment and a motion to dismiss the Second Petition.

Father had also filed a petition for parentage in the juvenile court on January 9, 2018. In his motion to transfer Petitioners' action to chancery court, Father averred that when he had appeared for a hearing on his parentage petition in the juvenile court, Petitioners' counsel had appeared and informed the juvenile court that they had filed a petition for adoption in the trial court. The record indicates that Petitioners filed a notice in the juvenile court in May 2018 concerning the filing of the Second Petition. The juvenile court subsequently transferred Father's parentage petition to the trial court pursuant to Tennessee Code Annotated § 36-1-117(b)(1) (Supp. 2020) ("If a petition has been filed to establish paternity of the child who is the subject of the adoption proceeding, the adoption court shall have exclusive jurisdiction to hear and decide any paternity petition filed in the adoption proceeding . . . .").

On August 10, 2018, Petitioners filed a motion in the trial court to set aside the visitation order, requesting "that all orders compelling visitation to occur between the putative father and the minor child be suspended or set aside until such time as this Court has heard evidence to determine what, if any, visitation is in the child's best interest." Father filed a response opposing Petitioners' motion to set aside visitation. Following a hearing conducted on October 4, 2018, with all of the actions concerning the Child now consolidated, the trial court entered an order on October 31, 2018, denying Petitioners'

motion to set aside the visitation order. However, the trial court found that it was in the Child's best interest to reduce Father's supervised visitation to two hours per week, specifically set for Wednesdays and Thursdays from 10:00 a.m. to 11:00 a.m. at the Hannah's Hope facility. The trial court noted in its order that although Father was represented by counsel during the hearing, he had failed to appear personally. In its final termination order, the trial court stated that the October 2018 hearing had initially been set to also address Father's parentage petition but that with Father's absence, the parentage petition had been continued at that time.

The trial court bifurcated the termination proceedings, first conducting a bench trial regarding statutory grounds over the course of three days on May 2, May 6, and May 7 of 2019 and then conducting a bench trial concerning the Child's best interest over the course of two days on September 25 and October 1 of 2019. In the interim, during a hearing conducted on August 21, 2019, the trial court orally announced its ruling that statutory grounds to terminate Father's parental rights to the Child had been established by clear and convincing evidence. At the beginning of the trial on statutory grounds, the trial court heard Father's testimony regarding his parentage petition and reviewed the transferred juvenile court record, including the DNA test report indicating that Father was the biological father of the Child. Although the trial court ruled orally on May 2, 2019, that Father had established parentage of the Child, the ruling was not memorialized until the trial court entered an order establishing parentage on June 9, 2020.

Concerning visitation during the pendency of the proceedings, the trial court conducted a hearing on December 13, 2019, upon a motion filed by Hannah's Hope. The trial court subsequently entered an order in January 2020, apparently *nunc pro tunc* to the December 2019 hearing, setting forth a winter holiday visitation schedule and providing, *inter alia*, that no visits would occur between Father and the Child during the weeks of December 23, 2019, and December 30, 2019. In this order, the trial court also directed that if Father were "more than 15 minutes late to his scheduled visits, Hannah's Hope [could] terminate the scheduled visit." On February 20, 2020, Petitioners filed a "Motion for Entry of Final Order or to Suspend Visitation Pending Entry of Final Order," requesting that the trial court enter an attached proposed order or, in the alternative, issue an oral ruling as to best interest and suspend Father's visitation with the Child pending entry of a final written order if the court found that termination of Father's parental rights was in the Child's best interest. Upon an emergency petition for injunctive relief also filed by Petitioners, the trial court conducted a hearing and entered an order on March 2, 2020, directing the parties to refrain from discussing Father's status as a parent or the Child's legal name with the Child.

During the trial on statutory grounds, Petitioners called Father to testify, and he also testified on his own behalf. Petitioners also presented testimony from Mother and

Reverend Patricia ("Trina") Morrison, the Executive Director of Hannah's Hope. The same individuals testified during the trial concerning best interest. In addition, Hannah's Hope presented testimony from Susan Prince, a licensed clinical social worker employed by its facility who supervised nearly all visits that occurred between Father and the Child, and Katherine B. testified on behalf of Petitioners. Father presented testimony from his mother ("Paternal Grandmother"), who, although acknowledging that she had never met the Child, testified that she was supportive of Father's desire to obtain custody.

Following the second phase of trial, the trial court announced its ruling that it was in the best interest of the Child to terminate Father's parental rights during a separate hearing conducted on May 29, 2020. However, the trial court did not enter its final order terminating Father's parental rights until October 7, 2020. Incorporating by reference its memorandum opinions from the transcripts of its August 2019 and May 2020 oral rulings, the trial court found clear and convincing evidence of all grounds alleged by Hannah's Hope and Petitioners, except that the trial court did not address Petitioners' allegation concerning the statutory ground provided by Tennessee Code Annotated § 36-1-113(g)(14) (failure of a parent or guardian to manifest an ability and willingness to personally assume legal and physical custody or financial responsibility of the child).

In finding, as to both petitions, that it was in the Child's best interest for Father's parental rights to be terminated, the trial court analyzed the statutory factors provided in Tennessee Code Annotated § 36-1-113(i) (2017). The trial court placed the Child "in the complete custody, control and guardianship of Hannah's Hope" with "the right to consent to such adoption *in loco parentis*."

Father initially filed a premature notice of appeal in June 2020 following the trial court's oral announcement of its final ruling in May 2020. Pursuant to Tennessee Rule of Appellate Procedure 4(d), this Court treated Father's premature notice of appeal as timely upon entry of the trial court's final order on October 7, 2020.[2] Hannah's Hope and Petitioners (collectively, "Appellees") have proceeded jointly on appeal.

---

[2] As a result of Father's premature notice of appeal and a premature filing of a portion of the trial court record with this Court, the appellate record was not fully supplemented until after the parties had initially filed their appellate briefs. Following supplementation of the record and upon Appellees' motion, they were allowed to file an amended joint responsive brief in which they asserted, *inter alia*, that Father's factual references in his principal and reply briefs that were not accompanied by citations to the record should be disregarded. However, upon Father's motion, this Court entered an order allowing Father to file an amended reply brief following oral argument with the amendments "limited to updated citations to the recently filed supplemental record." Inasmuch as Father subsequently filed a reply brief amended with the applicable citations to the record, we will not further address Appellees' argument in this regard.

- 7 -

## II.  Issues Presented

Father has raised two issues on appeal, which we have restated slightly as follows:

1.      Whether the trial court erred by finding clear and convincing evidence supporting statutory grounds to terminate Father's parental rights to the Child.

2.      Whether the trial court erred by finding clear and convincing evidence that it was in the Child's best interest to terminate Father's parental rights.

## III.  Standard of Review

In a termination of parental rights case, this Court has a duty to determine "whether the trial court's findings, made under a clear and convincing standard, are supported by a preponderance of the evidence." *In re F.R.R., III*, 193 S.W.3d 528, 530 (Tenn. 2006).  The trial court's findings of fact are reviewed *de novo* upon the record, accompanied by a presumption of correctness unless the evidence preponderates against those findings.  *See* Tenn. R. App. P. 13(d); *see also In re Carrington H.*, 483 S.W.3d 507, 523-24 (Tenn. 2016); *In re F.R.R., III*, 193 S.W.3d at 530.  Questions of law, however, are reviewed *de novo* with no presumption of correctness.  *See In re Carrington H.*, 483 S.W.3d at 524 (citing *In re M.L.P.*, 281 S.W.3d 387, 393 (Tenn. 2009)).  The trial court's determinations regarding witness credibility are entitled to great weight on appeal and shall not be disturbed absent clear and convincing evidence to the contrary.  *See Jones v. Garrett*, 92 S.W.3d 835, 838 (Tenn. 2002).

"Parents have a fundamental constitutional interest in the care and custody of their children under both the United States and Tennessee constitutions."  *Keisling v. Keisling*, 92 S.W.3d 374, 378 (Tenn. 2002).  It is well established, however, that "this right is not absolute and parental rights may be terminated if there is clear and convincing evidence justifying such termination under the applicable statute."  *In re Drinnon*, 776 S.W.2d 96, 97 (Tenn. Ct. App. 1988) (citing *Santosky v. Kramer*, 455 U.S. 745 (1982)).  As our Supreme Court has explained:

The parental rights at stake are "far more precious than any property right." *Santosky* [*v. Kramer*], 455 U.S. [745,] 758-59 [(1982)].  Termination of parental rights has the legal effect of reducing the parent to the role of a complete stranger and of ["]severing forever all legal rights and obligations of the parent or guardian of the child."  Tenn. Code Ann. § 36-1-113(l)(1); *see also Santosky*, 455 U.S. at 759 (recognizing that a decision terminating

parental rights is "*final* and irrevocable"). In light of the interests and consequences at stake, parents are constitutionally entitled to "fundamentally fair procedures" in termination proceedings. *Santosky*, 455 U.S. at 754; *see also Lassiter v. Dep't of Soc. Servs. of Durham Cnty, N.C.*, 452 U.S. 18, 27 (1981) (discussing the due process right of parents to fundamentally fair procedures).

Among the constitutionally mandated "fundamentally fair procedures" is a heightened standard of proof—clear and convincing evidence. *Santosky*, 455 U.S. at 769. This standard minimizes the risk of unnecessary or erroneous governmental interference with fundamental parental rights. *Id.*; *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010). "Clear and convincing evidence enables the fact-finder to form a firm belief or conviction regarding the truth of the facts, and eliminates any serious or substantial doubt about the correctness of these factual findings." *In re Bernard T.* 319 S.W.3d at 596 (citations omitted). The clear-and-convincing-evidence standard ensures that the facts are established as highly probable, rather than as simply more probable than not. *In re Audrey S.*, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005); *In re M.A.R.*, 183 S.W.3d 652, 660 (Tenn. Ct. App. 2005).

\* \* \*

In light of the heightened burden of proof in termination proceedings, however, the reviewing court must make its own determination as to whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, amount to clear and convincing evidence of the elements necessary to terminate parental rights. *In re Bernard T.*, 319 S.W.3d at 596-97.

*In re Carrington H.*, 483 S.W.3d at 522-24. "[P]ersons seeking to terminate [parental] rights must prove all the elements of their case by clear and convincing evidence," including statutory grounds and the best interest of the child. *See In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010).

## IV. Grounds for Termination of Father's Parental Rights

Tennessee Code Annotated § 36-1-113 (Supp. 2020) lists the statutory requirements for termination of parental rights, providing in relevant part:

(a) The chancery and circuit courts shall have concurrent jurisdiction with the juvenile court to terminate parental or guardianship rights to a child in a separate proceeding, or as a part of the adoption proceeding by utilizing any grounds for termination of parental or guardianship rights permitted in this part or in title 37, chapter 1, part 1 and title 37, chapter 2, part 4.

* * *

(c) Termination of parental or guardianship rights must be based upon:

(1) A finding by the court by clear and convincing evidence that the grounds for termination of parental or guardianship rights have been established; and

(2) That termination of the parent's or guardian's rights is in the best interests of the child.

The trial court determined that the evidence clearly and convincingly supported a finding of ten statutory grounds to terminate Father's parental rights, including four abandonment grounds and six grounds applicable to a putative father. We will address each statutory ground in turn and, when applicable, address statutory determinative periods as alleged in each of the two termination petitions.

## A. Statutory Abandonment

Concerning statutory abandonment, Tennessee Code Annotated § 36-1-113(g)(1) (Supp. 2020) provides, as relevant to this action:

(g) Initiation of termination of parental or guardianship rights may be based upon any of the grounds listed in this subsection (g). The following grounds are cumulative and nonexclusive, so that listing conditions, acts or omissions in one ground does not prevent them from coming within another ground:

(1) Abandonment by the parent or guardian, as defined in § 36-1-102, has occurred; . . .

- 10 -

Regarding the definition of abandonment applicable to this ground, the version of Tennessee Code Annotated § 36-1-102(1) (2017) in effect at the time of both termination petitions' filing in this action defined abandonment in pertinent part as:[3]

> (A)(i) For a period of four (4) consecutive months immediately preceding the filing of a proceeding or pleading to terminate the parental rights of the parent or parents or the guardian or guardians of the child who is the subject of the petition for termination of parental rights or adoption, that the parent or parents or the guardian or guardians either have willfully failed to visit or have willfully failed to support or have willfully failed to make reasonable payments toward the support of the child; . . .
>
> * * *
>
> (iii) A biological or legal father has either willfully failed to visit or willfully failed to make reasonable payments toward the support of the child's mother during the four (4) months immediately preceding the birth of the child; . . .

On appeal, Father argues that Hannah's Hope "should not have standing to pursue" the statutory abandonment grounds because Mother had surrendered her parental rights and the chancery court had awarded partial guardianship to Hannah's Hope less than one month prior to the filing of the First Petition. Appellees assert that Father's standing argument is waived because he did not raise it before the trial court. Our review of the record confirms that Father did not raise this standing argument as to Hannah's Hope before the trial court and that it was not expressly addressed by the trial court.[4] However, "standing is an issue that cannot be waived in a termination of parental rights/adoption case." *In re Joseph F.*, 492 S.W.3d 690, 696 (Tenn. Ct. App. 2016)

---

[3] Effective July 1, 2018, the General Assembly has amended Tennessee Code Annotated § 36-1-102(A) to substitute the phrase, "proceeding, pleading, petition, or any amended petition," in place of "proceeding or pleading." *See* 2018 Tenn. Pub. Acts, Ch. 875, § 1 (H.B. 1856). Pursuant to the same amendment, the words, "willful" and "willfully," have been deleted wherever they previously appeared in subsection -102(1), and a new subsection, -102(1)(I), has been added, providing that the "absence of willfulness" shall be an affirmative defense to abandonment for failure to visit or support, for which "[t]he parent or guardian shall bear the burden of proof." *See id.* at § 2. Inasmuch as the instant petitions were filed respectively in September 2017 and May 2018, we will confine our analysis in this Opinion to the version of Tennessee Code Annotated § 36-1-102 in effect at those times.

[4] Father raised a different standing argument against Petitioners in answer to their petition filed in the trial court, asserting that Petitioners did not have standing because Hannah's Hope had previously filed a petition in the chancery court. Father has not raised this issue on appeal.

(citing *Osborn v. Marr,* 127 S.W.3d 737, 740 (Tenn. 2004)). As this Court explained in *Joseph F.*:

> Although the issue of standing can be waived in certain types of cases, *see In re Estate of Smallman*, 398 S.W.3d 134, 148 (Tenn. 2013), our Supreme Court has ruled that "[w]hen a statute [such as the adoption statute] creates a cause of action and designates who may bring an action, the issue of standing is interwoven with that of subject matter jurisdiction and becomes a jurisdictional prerequisite." *Osborn v. Marr,* 127 S.W.3d 737, 740 (Tenn. 2004).

*Id.* We therefore cannot deem Father's standing argument to be waived.

As Appellees point out, Tennessee Code Annotated § 36-1-113(b)(1) (Supp. 2020) provides in pertinent part that "any licensed child-placing agency having physical custody of the child . . . shall have standing to file a petition pursuant to this part or title 37 to terminate parental or guardianship rights of a person alleged to be a parent or guardian of the child." It is undisputed that Hannah's Hope is a licensed child-placing agency. "Physical custody" is defined within the statutory scheme as follows:

> "Physical custody" means physical possession and care of a child. "Physical custody" may be constructive, as when a child is placed by agreement or court order with an agency, or purely physical, as when any family, including a formal or informal foster family, has possession and care of a child, so long as such possession was not secured through a criminal act. <u>An agency and a family may have physical custody of the same child at the same time</u>[.]

Tenn. Code Ann. § 36-1-102(39) (2017) (emphasis added).[5] Pursuant to the chancery court's August 2017 order granting partial guardianship of the Child to Hannah's Hope, the agency had physical custody of the Child under the statutory definition and therefore had standing to file the First Petition in September 2017. Father's argument in this regard is unavailing.

---

[5] Effective July 1, 2019, the General Assembly has recodified the definition of "physical custody" so that it is now found at Tennessee Code Annotated § 36-1-102(40). *See* 2019 Tenn. Pub. Acts, Ch. 36, § 31 (S.B. 208).

## 1. Willful Failure to Visit the Child

Father contends that the trial court erred in finding by clear and convincing evidence that he had abandoned the Child by willfully failing to visit her during the four months preceding the First Petition's filing. Given that this ground was not alleged in the Second Petition, the trial court found that the only four-month statutorily determinative period for purposes of abandonment by failure to visit in this case began on May 18, 2017, and concluded on September 18, 2017, the day before Hannah's Hope filed its petition. However, we note that the beginning point of this time period should be May 19, 2017, rendering a statutorily determinative period spanning May 19, 2017, through September 18, 2017 ("First Determinative Period"). *See In re Joseph F.*, 492 S.W.3d at 702 (explaining that the applicable four-month statutory period preceding filing of the termination petition "began on March 8, 2011, and concluded on July 7, 2011, the day prior to the filing of the termination petition") (citing *In re Jacob C.H.*, No. E2013-00587-COA-R3-PT, 2014 WL 689085, at *6 (Tenn. Ct. App. Feb. 20, 2014)). Because we find that this one-day difference in the beginning of the First Determinative Period does not affect our analysis of this statutory ground, we determine the trial court's inclusion of the extra day to be harmless error. *See, e.g.*, *In re Jacob C.H.*, No. E2013-00587-COA-R3-PT, 2014 WL 689085, at *6 (Tenn. Ct. App. Feb 20, 2014).

In its final order, the trial court specifically found concerning the First Determinative Period that Father had "made one token visit with [the Child] and [Mother] in May 2017 at a park" and that Mother had "not prevent[ed] [Father] from visiting" the Child "prior to [Mother's] surrender of parental rights." Mother surrendered her parental rights on August 30, 2017. The trial court further found that the "majority of [Father's] visits with [the Child] occurred outside the relevant four-month time period for both petitions." Inasmuch as Father undisputedly visited the Child only one time prior to September 2017, this is unequivocally true of the First Determinative Period. Additionally, the trial court credited Mother's testimony that she "had to find multiple caregivers for [the Child] prior to surrendering her parental rights," indicating that Mother had not relied on Father to care for the Child at all during the First Determinative Period.

In regard to this statutory ground, Father primarily contends that the trial court erred in finding that his failure to visit the Child more than once during the First Determinative Period was willful because Mother "disappeared," effectively preventing him from visiting the Child. Father asserts that he filed an answer to the First Petition in which he averred that prior to receiving notice from Hannah's Hope in August 2017 of Mother's surrender, he had been unaware of Mother's intent to surrender her parental rights and place the Child for adoption. He notes that he sought custody of the Child in his answer to the First Petition. Appellees contend that the trial court properly found that

Mother did not prevent Father from visiting the Child during the First Determinative Period and that Father's filing of an answer to the First Petition does not change the fact that he failed to visit the Child during the applicable period. Upon careful review, we conclude that the trial court did not err in finding Father's failure to visit the Child during the First Determinative Period to be willful.

As this Court has previously explained:

Willfulness in the context of termination proceedings does not require the same standard of culpability as is required by the penal code, nor does it require that the parent acted with malice or ill will. *In re Audrey S.,* 182 S.W.3d at 863; *see also In re S.M.*, 149 S.W.3d 632, 642 (Tenn. Ct. App. 2004). Rather, a parent's conduct must have been willful in the sense that it consisted of intentional or voluntary acts, or failures to act, rather than accidental or inadvertent acts. *In re Audrey S.*, 182 S.W.3d [838,] 863 [(Tenn. Ct. App. 2005)]. "A parent cannot be said to have abandoned a child when his failure to visit or support is due to circumstances outside his control." *In re Adoption of Angela E.*, 402 S.W.3d [636,] 640 [(Tenn. 2013)] (citing *In re Adoption of A.M.H.*, 215 S.W.3d [793,] 810 [(Tenn. 2007)] (holding that the evidence did not support a finding that the parents "intentionally abandoned" their child)).

*In re Alysia S.*, 460 S.W.3d 536, 565-66 (Tenn. Ct. App. 2014).

Father testified that Mother contacted him and M.P., his then-girlfriend, in February 2017 via a Facebook message to inform them that the Child had been born in late January. According to Father, Mother told him in that message that she did not want him to have anything to do with the Child and subsequently "blocked" him on Facebook. Father acknowledged that Mother then "unblocked" him two or three weeks later, contacting him via Facebook at the end of February to ask him if he wanted to see the Child. Father testified that in response to this invitation, he arranged to meet Mother and the Child in a park for a few hours. However, he acknowledged that this meeting did not take place until May 2017 and that the park visit was the only time he visited the Child prior to the filing of the First Petition. Father also testified that on the day of the park visit, he drove Mother to the street where she resided and that although Mother had told him that Maternal Grandmother would not want him to visit the house, he identified which house it was by watching Mother arrive at home.

By his own admission, Father knew by May 2017, the beginning of the First Determinative Period, where Mother resided, and he knew where she had attended college. His insistence that Mother "disappeared" appears to be based on Mother's

having intermittently ended Facebook contact with him. Father did not describe any further efforts during the First Determinative Period to visit the Child. "A parent's failure to visit a child is not excused by another person's conduct 'unless the conduct actually prevents the person with the obligation from performing his or her duty . . . or amounts to a significant restraint of or interference with the parent's efforts to support or develop a relationship with the child.'" *In re Jude M.*, 619 S.W.3d 224, 238 (Tenn. Ct. App. 2020) (quoting *In re Audrey S.*, 182 S.W.3d 838, 864 (Tenn. Ct. App. 2005) (additional internal citations omitted in *Jude M.*)).

Mother corroborated Father's testimony that she invited him to see the Child in February 2017 and that a visit took place in a park in May 2017. When further questioned regarding what efforts Father made to see the Child between the Child's birth and May 2017, Mother responded: "That one day we went to the park." Mother testified that in May 2017, she and the Child actually resided with Maternal Grandmother's neighbor, Ms. R., because Maternal Grandmother had "put [her] out." Mother stated that she and the Child continued to live with Ms. R. through August 2017. Mother confirmed that Father knew where she lived between May 2017 and when she surrendered the Child in August 2017. Although testimony demonstrated that Father gave Mother a ride to a grocery store on another occasion during the First Determinative Period, this outing apparently did not include the Child. Mother denied that she had taken any action to prevent Father from contacting her between May 2017 and August 2017.

In determining that Mother had not prevented Father from visiting the Child during the First Determinative Period, the trial court expressly credited Mother's testimony and did not find credible Father's testimony that he had no control over the situation if Mother "want[ed] to go off radar." This Court has often held that a parent's "demeanor and credibility as a witness also play an important role in determining intent, and trial courts are accordingly in the best position to make such determinations." *In re Adoption of Destiny R.D.*, No. M2011-01153-COA-R3-PT, 2012 WL 1066496, at *7 (Tenn. Ct. App. Mar. 27, 2012) (citing *In re D.L.B.*, 118 S.W.3d 360, 367 (Tenn. 2003)). We will not disturb the trial court's credibility determinations. Moreover, we conclude that the evidence does not preponderate against the trial court's finding that Mother did not prevent Father from visiting the Child from the beginning of the First Determinative Period through her surrender of the Child on August 30, 2017.

Following Mother's surrender, nineteen days remained in the First Determinative Period before Hannah's Hope filed the First Petition. Father testified that he was unaware of Mother's decision to surrender her parental rights until he received a letter from Hannah's Hope. Reverend Morrison testified that Hannah's Hope sent two copies of a certified letter addressed to Father on September 1, 2017, one to each of the two addresses that staff had found in public records for Father. Although he testified that he

was not the individual who signed the return receipt of the certified letter from Hannah's Hope and that a neighbor brought him the letter, Father acknowledged that he did receive one of the letters. Father initially identified the approximate date of his receipt of the letter as August 2017. He subsequently testified that upon receiving the letter, he "[i]mmediately called Hannah's Hope and told them that I didn't know my child was placed for adoption, and I wanted to get her."

Reverend Morrison testified that Father made his first contact with Hannah's Hope in mid-October 2017 when he telephoned and informed Reverend Morrison that he did not know that Mother had surrendered her parental rights. By that time, Hannah's Hope had filed the First Petition, for which Father does not dispute that he received notice. Father filed his answer to the First Petition on October 25, 2017, stating that he did not know about Mother's surrender and that he desired to seek custody of the Child. As to why he had not responded sooner, Father stated in his answer: "The reason why I am just responding because I was in Greenville, MS visiting relatives and when I returned my neighbor approached me with the summons paper from chancery court that came in his mailbox instead of mine[]." Whether Father learned of Mother's surrender a few days after it occurred, as his testimony concerning receipt of the letter would seem to indicate, or in October 2017, as his answer would indicate, it is clear that Father was not attempting to visit the Child during the nineteen days remaining in the First Determinative Period between Mother's surrender and the filing of the First Petition. He made no attempts to contact Mother during that timeframe and, according to his answer, had apparently left the state without making any provisions to visit the Child.

Furthermore, we agree with the trial court's finding that Father's one visit with the Child during the First Determinative Period was token in nature. Tennessee Code Annotated § 36-1-102(1)(C) defines token visitation as "perfunctory visitation or visitation of such an infrequent nature or of such short duration as to merely establish minimal or insubstantial contact with the child." *See also In re Keri C.,* 384 S.W.3d 731, 748 (Tenn. Ct. App. 2010) ("Whether visitation is 'token' under this definition is a fact-intensive inquiry to be decided on a case-by-case basis."). Having determined that Father knew the whereabouts of Mother and the Child for the majority of the First Determinative Period and that Mother did not prevent Father from visiting the Child, we further determine that Father's one visit with the Child in the park in May 2017 "merely establish[ed] minimal or insubstantial contact" with the Child. *See* Tenn. Code Ann. § 36-1-102(1)(C); *see, e.g.*, *In re Audrey S.,* 182 S.W.3d 838, 867 (Tenn. Ct. App. 2005) (concluding that the mother's one or two visits with the children in the four months preceding the mother's incarceration were "nothing more than token visitation").

We conclude that the evidence does not preponderate against the trial court's finding by clear and convincing evidence that Father abandoned the Child by willfully

failing to visit her during the First Determinative Period. The trial court did not err in terminating Father's parental rights to the Child based upon this statutory ground.

## 2. Willful Failure to Support the Child

Father also contends that the trial court erred in finding by clear and convincing evidence that he had abandoned the Child by willfully failing to financially support her during the four months preceding the filing of each termination petition. The trial court correctly noted that because this ground was alleged in both petitions and because the petitions were filed several months apart, a different statutorily determinative period applied for each petition. *See In re D.L.B.*, 118 S.W.3d 360, 366 (Tenn. 2003) ("[W]e conclude that Tennessee Code Annotated section 36-1-102(1)(A)(i) requires that the willful failure to visit, support, or make reasonable payments toward the support of the child must have occurred in the four months immediately preceding the filing of the petition currently before the court."). In this case, both petitions were before the trial court at the time of trial. As with abandonment through willful failure to visit, the First Determinative Period (May 19, 2017, through September 18, 2017) applies to this ground as alleged in the First Petition.

Concerning the ground as alleged in the Second Petition, the trial court found that the determinative period began on January 7, 2018, and concluded on May 7, 2018. However, the determinative four-month period preceding the filing of the Second Petition would have been January 7, 2018, through May 6, 2018 ("Second Determinative Period"). *See In re Joseph F.*, 492 S.W.3d at 702. Because we find that this one-day difference in the conclusion of the Second Determinative Period does not affect our analysis of this statutory ground, we further determine the trial court's inclusion of the day of the Second Petition's filing, May 7, 2018, to be harmless error. *See, e.g.*, *In re Jacob C.H.*, 2014 WL 689085, at *6.

Although Father does not specifically argue that the trial court erred in finding his failure to support the Child to be willful, we note that under the applicable version of the statute, Hannah's Hope and Petitioners were each respectively required to carry the burden of proving Father's willfulness, which included proving that Father had the ability to provide financial support during the respective determinative periods. *See In re Seth Mc.*, No. M2017-02562-COA-R3-PT, 2018 WL 3060366, at *5 (Tenn. Ct. App. June 20, 2018) ("Without evidence to establish that Mother had the ability to pay support for her children during the relevant time period, we conclude that [the Department of Children's Services] failed to show by clear and convincing evidence that Mother failed to support or make reasonable payments toward the support of her children to prove the ground of abandonment set forth in Tenn. Code Ann. § 36-1-102(1)(A)(iv)."). Failure to visit or support a child is "willful" when a person is "aware of his or her duty to visit or support,

has the capacity to do so, makes no attempt to do so, and has no justifiable excuse for not doing so." *In re Audrey S.*, 182 S.W.3d at 864. It is well settled in Tennessee that every parent is presumed to have knowledge of a parent's duty to support his or her minor children regardless of whether a court order to that effect is in place. *See* Tenn. Code Ann. § 36-1-102(1)(H) ("Every parent who is eighteen (18) years of age or older is presumed to have knowledge of a parent's legal obligation to support such parent's child or children[.]").

The trial court's findings regarding Father's income and ability to pay support are inclusive of both determinative periods. Father does not dispute the trial court's finding that he received "monthly disability income in the amount of $750," which the court found "increased to $771.00 beginning January 1, 2019." When questioned regarding his disability, Father explained that he could "read to a certain extent certain words." Paternal Grandmother testified that Father had obtained Supplemental Security Income ("SSI") benefits after having a "rod in his leg" but also testified that Father had previously experienced a "speech problem." In a response filed in answer to an interrogatory, Father stated that he had received SSI benefits "since about 2015 because [he has] a rod and screws in [his] leg." The trial court found that the reason for Father's SSI benefits was not clear from the proof presented at trial. However, the court further found that Father's disability did not prevent him from "providing some financial support for the Child."

It is well settled in Tennessee that SSI benefits are not subject to legal process for payment of court-ordered child support. *See Tenn. Dep't of Human Servs., ex rel. Young v. Young*, 802 S.W.2d 594, 599 (Tenn. 1990). However, this Court has considered a parent's disability benefits in the context of parental rights termination to find that a parent could have provided some amount of support for his child. *See, e.g., In re Miracle M.*, No. W2017-00068-COA-R3-PT, 2017 WL 3836020, at *6 (Tenn. Ct. App. Aug. 30, 2017) (affirming the trial court's finding that the father "could have paid some amount of support" when he received "income of at least $735.00 per month" in disability benefits and had "income sufficient to support his [smoking] habit").

Concerning Father's additional income beyond disability benefits, the trial court specifically found:

> [Father] performs odd jobs for additional income but he did not ensure that any additional money earned went toward the care and maintenance of [the Child]. [Father] claims to be in the music business and sometimes works for his brother, but [Father] has not maintained consistent employment. Social media posts reflect [Father] handling large amounts of

money. [Father's] testimony about his income and ability to earn income was not credible.

The trial court also found that Father resided with Paternal Grandmother and an adult son and that, as Father acknowledged, Paternal Grandmother was the payee for his disability benefits.

Father executed an affidavit of indigency on November 1, 2017, which he filed in the chancery court with his motion for appointment of counsel. Father testified at trial that at the time of the affidavit, he had routine expenses in the amount of approximately $400 per month, including $200 per month in rent. When questioned regarding the approximately $300 monthly balance remaining from his disability benefits after expenses, Father responded that at the time he had been saving to repair his vehicle because the individuals for whom he performed odd jobs had been complaining that his vehicle was unreliable. As the trial court noted in its final order, Father also testified that he had never had a driver's license and could not obtain one at the time of trial because his ability to obtain a license had been suspended due to unpaid citations.

In January 2018, Father filed a second "Affidavit of Indigency" with the juvenile court. However, although Father signed this "affidavit," it was not notarized. This second "affidavit" was therefore not completed under oath. *See State, Dep't of Human Servs. v. Neilson*, 771 S.W.2d 128, 130 (Tenn. Ct. App. 1989) ("An affidavit is an oath reduced to writing."). In his January 2018 unnotarized statement, Father delineated expenses of $400 in rent, $100 to $150 monthly for electricity, and $266 monthly in other expenses, listed as "telephone, school supplies, clothing, and toiletries." According to this statement, Father's monthly expenses, totaling $766 to $816, were higher than his disability income. Although Father was not questioned regarding this January 2018 statement during trial, Petitioners did present it as an exhibit during the best interest phase of trial.

Additionally, during the grounds phase of trial, Hannah's Hope presented Father's November 2018 response to an interrogatory wherein Father had listed expenses consisting of $300 in rent and a total of $290 for utilities, toiletries, and a telephone, plus $40 every three days for gasoline. When confronted on cross-examination with an estimated total of $900 in expenses monthly inclusive of the gasoline, Father at first challenged the total as too high and then stated that the gasoline had been necessary before his vehicle had been repaired to stop it from burning extra gasoline. Father did testify that his rent had risen, attempting to account for the difference between the $200 in rent he had listed in his November 2017 affidavit and the $400 rent he had listed in his January 2018 unnotarized statement. The trial court found that Father's testimony concerning his income and expenses was not credible.

The trial court further found that Father was "the father of five to nine children and has or should have knowledge of a child's daily needs," noting that Father did "not have legal custody of any of his minor children." On his November 2017 affidavit of indigency, Father listed five children as dependents, including the Child and an adult son who lived with him and Paternal Grandmother. During trial, Father first testified that he had six children, then amended the number to seven, and subsequently, in answer to a question, agreed that he had eight children in addition to the Child. Father stated that he had listed only five children on the affidavit because the form provided only five lines. Father testified that in addition to the Child and the adult son who lived with him, he had another adult son, two minor children with M.P. (his girlfriend at the time he met Mother); two minor children with another woman, L.W.; and one minor child with a different woman, A.G. Father acknowledged that the youngest of his children with M.P. had been born after the Child who is the subject of the instant action had been born.

When questioned regarding why he had not included child support for any of his minor children as an expense on his November 2017 affidavit, Father responded in relevant part:

> No, I didn't list that there, because at the time I thought it was actually child support for [the Child]. I was supporting my other kids, which I have reports of that, because I have that seeing my other kids, that I pay child support to through Western Union and Moneygrams.

Father acknowledged that when he completed the affidavit of indigency, he "put a line" through the blank next to child support because he was not paying any support for the Child at that time.

The trial court found that "no credible proof was presented that [Father] consistently supports his other children." We note that as to the content of exhibits presented at trial and not otherwise in the record, we are limited in this case to review based on the trial court's findings and testimony concerning the exhibits. Although the trial transcripts are in the supplemented appellate record, the trial exhibits are not. According to the trial transcripts, Father did not present any documentation of support paid for his other children during the two determinative periods at issue here.[6]

The trial transcript from the statutory grounds proceedings does indicate that Hannah's Hope presented a copy of a 2015 juvenile court order wherein the court

---

[6] The trial transcript from the best interest proceedings indicates that Father presented three money order receipts at that time reflecting that he had made support payments for two of his other minor children; however, these payments were made after the end of the statutorily determinative periods.

directed Father to pay child support to A.G. for the benefit of the child they had together. Although Father testified that he remembered receiving a letter having something to do with the 2015 juvenile court order, he gave no indication that he had paid support pursuant to the order during either of the determinative periods. In considering Father's ability to pay support for the Child at issue here, we are therefore unable to credit Father with specific expenses paid to support his other minor children. *See Kries v. Kries*, No. E2004-00132-COA-R3-CV, 2004 WL 2709207, at *2 (Tenn. Ct. App. Nov. 29, 2004) ("[I]t is the appellant's responsibility to assure that the record is accurate and adequate to allow the Court to review and dispose of the issues.").

In sum, Father's disability benefits were at least $750 monthly, and he testified to earning some additional income. Although he also testified to a varying amount of expenses, he at no time denied, and does not deny on appeal, that he was capable of paying some reasonable amount of child support for the Child. Moreover, the trial court found Father's varying testimony concerning his income beyond his disability benefits and his monthly expenses not to be credible. We will next address the trial court's findings as to Father's willful failure to support specifically as to each petition and corresponding determinative period.

### a. First Petition

The trial court found that during the First Determinative Period, Father had only "bought [the Child] a pair of shoes that were not the correct size for her," presented during the park visit in May 2017, and had "provided no monetary support" for the Child. The trial court further found that the shoes constituted only token support. *See* Tenn. Code Ann. § 36-1-102(1)(B) (Supp. 2020) (defining "token support" to mean "that the support, under the circumstances of the individual case, is insignificant given the parent's means"). On appeal, Father does not refute these findings concerning the First Determinative Period. He simply argues that the evidence of his failure to support was not clear and convincing.[7] We disagree.

Upon careful review, we determine that the evidence does not preponderate against the trial court's finding, by clear and convincing evidence, that Father had the ability to make reasonable payments toward the support of the Child during the First Determinative Period. Father testified that although he had been pursuing a music career since he was a teenager, he had not earned any funds from his music. Father stated that

---

[7] Father testified that he had given Mother $100 for the Child's support during the May 2017 park visit, but Mother denied that Father had given her any money in May 2017 or at any time after the Child's birth. The trial court clearly credited Mother's testimony as to this point, and on appeal, Father has not disputed the court's factual finding that the shoes were his only contribution during the First Determinative Period.

he and his brother had "cut an album together," which his brother had paid to produce. When confronted with a photograph of himself with what appeared to be a large bowl of marijuana, Father stated that it was "prop marijuana" he had posed with to promote his music.

The trial court generally did not credit Father's testimony concerning his income, and we defer to the trial court's credibility determination. We note, however, that even accepting that Father had earned no funds from his music, by his own testimony, Father earned some income in addition to his disability benefits by performing "odd jobs" for individuals. Father further testified that in the months following the filing of the Second Petition, he had been utilizing funds earned from these odd jobs to pay some support for the Child. He gave no indication that such funds would have been unavailable to him during the First Determinative Period and offered no justifiable excuse for failing to make reasonable payments toward the Child's support during this timeframe.

We therefore conclude that the evidence does not preponderate against the trial court's finding by clear and convincing evidence that Father abandoned the Child by willfully failing to financially support her during the First Determinative Period. The trial court did not err in terminating Father's parental rights based upon this ground as alleged in the First Petition.

b. Second Petition

The trial court found that during the Second Determinative Period (January 7, 2018, through May 6, 2018), Father "provided $27.00 in token financial support" for the Child. Reverend Morrison testified that Hannah's Hope received a letter from Father, dated March 31, 2018, with a money order in the amount of $27 for the Child's support, and that this was the only financial support received from Father during the Second Determinative Period. Reverend Morrison also testified that during the Second Determinative Period, Father did not provide any "necessaries" for the Child. However, reviewing her records, which she stated were updated at the end of each visit, Reverend Morrison reported that Father had brought some type of gift or gifts for the Child to seven visits occurring during the Second Determinative Period, including one visit in January 2018, two in February 2018, and four in April 2018. According to Reverend Morrison, these gifts generally consisted of clothing, toys, or food items. Reviewing a photograph of items provided by Father during his April 2018 visits, Reverend Morrison stated that the items included one box of diapers that would have been "close" in size to the Child's size at that time, a "sippy" cup, a jar of petroleum jelly, two packages of baby food, three canisters of "yogurt puff snacks," and a bottle of baby shampoo.

Father asserts that clear and convincing evidence does not support this statutory ground in part because he "provided receipts from money orders that he has provided to [Hannah's Hope] for the support of his child." However, other than the one money order provided in March 2018, Father is referring to support payments he began to make sporadically via money order to Hannah's Hope in June 2018 after the Second Determinative Period had ended. As found by the trial court and demonstrated by Hannah's Hope, the total amount of monetary support provided by Father to Hannah's Hope for the Child over the course of more than two years was $652. However, as to this statutory ground as alleged in the Second Petition, only Father's support provided to the Child during the Second Determinative Period is relevant. *See* Tenn. Code Ann. § 36-1-102(1)(F) ("Abandonment may not be repented of by resuming visitation or support subsequent to the filing of any petition seeking to terminate parental or guardianship rights or seeking the adoption of a child[.]").

Father did not demonstrate any change in his ability to provide financial support between the First and Second Determinative Periods. Having determined that Father had the ability to make reasonable payments toward the support of the Child during the First Determinative Period, we further determine that he had the same ability during the Second Determinative Period. Upon thorough review, we conclude that the evidence does not preponderate against the trial court's finding that the $27 and various items provided by Father during the Second Determinative Period constituted merely token support of the Child. *See* Tenn. Code Ann. § 36-1-102(1)(B); *see, e.g.*, *In re Hailey S.*, No. M2015-00842-COA-R3-PT, 2016 WL 3209444, at *11 (Tenn. Ct. App. May 31, 2016) (determining that small gifts provided to the child by the father constituted merely token support when the father was "admittedly capable of working and actually employed at various times"); *In re Kayden H.* No. E2014-02360-COA-R3-PT, 2015 WL 3876365, at *8 (Tenn. Ct. App. June 23, 2015) (affirming the trial court's finding that clothing items provided by the mother for the child constituted "only token support" when the mother was found to be "capable of employment"). We note also that Father's increased support of the Child subsequent to the Second Determinative Period, without any indication of a corresponding positive change in his financial status, demonstrated that he was capable of providing more than the $27 and small items he supplied for the Child during the Second Determinative Period.

We therefore conclude that the evidence does not preponderate against the trial court's finding by clear and convincing evidence that Father abandoned the Child by willfully failing to financially support her during the Second Determinative Period. The trial court did not err by terminating Father's parental rights based upon this ground as alleged in the Second Petition as well as in the First Petition.

### 3. Willful Failure to Visit Mother Preceding the Child's Birth

The trial court also found that Father had abandoned the Child by willfully failing to visit Mother in the four months preceding the Child's birth, as alleged in the Second Petition. *See* Tenn. Code Ann. § 36-1-102(1)(A)(iii) (2017). The version of the applicable statutory abandonment definition in effect at the time of the Second Petition's filing provided that "[a] biological or legal father" may be found to have abandoned the Child when he has willfully failed to visit "during the four (4) months immediately preceding the birth of the child." *See id.* In its final order, the trial court did not make an express finding regarding the statutorily determinative period applicable to this ground. However, the Child's birthdate was undisputedly January 31, 2017, as also noted by the trial court in its final order. We therefore conclude that the determinative period for this abandonment ground spanned October 1, 2016, through January 30, 2017 ("Prenatal Determinative Period"). *See, e.g.*, *In re A.S.C.*, No. E2013-01830-COA-R3-PT, 2014 WL 4269114, at * (Tenn. Ct. App. Aug. 29, 2014) (determining that the statutory time period applicable to this ground concluded on the day preceding the child's birth).

In determining that Father had willfully failed to visit Mother during the Prenatal Determinative Period, the trial court found that Mother had "informed [Father] of her pregnancy and his alleged paternity of [the Child] in June 2016" and that although Mother had "invited [Father] to attend a prenatal doctor's appointment," Father had "failed to attend." The trial court also found that Father had "purchased prenatal vitamins for [Mother]" in September 2016, a month during which undisputed testimony indicated that Father had taken Mother to a Walmart to purchase the vitamins and some food items for her and that he had then taken her to his home to spend the night. Although the trial court specifically found in its final order that "[t]he financial support or gifts provided to [Mother] during her pregnancy by [Father] [were] token in nature," the court did not expressly state that the one visit in September 2016 constituted token visitation. Upon careful review, we determine that whether this one visit was token is not dispositive of this statutory ground because the visit took place outside of the Prenatal Determinative Period.

Mother testified that she stayed with Father only one day and night while Father testified that it was "a couple of days." However, both Mother and Father testified that the outing to Walmart and stay at Father's house occurred during the month of September 2016. This visit therefore occurred prior to the Prenatal Determinative Period, which began on October 1, 2016. It is undisputed that Father did not visit Mother between October 1, 2016, and the Child's birth, and Father does not deny that the September 2016 visit was his only prenatal visit with Mother. Mother further testified that after the September 2016 trip to Walmart, Father wanted them to "be together" but that she said,

"no, we can co-parent." According to Mother, Father then became angry and changed his telephone number.

Moreover, Mother did not prevent Father from visiting more often, as evinced by the trial court's undisputed finding that Father did not attend the prenatal medical appointment to which Mother invited him. Mother testified that she invited Father to a prenatal doctor's appointment via a "Messenger" application in December 2016. She stated: "I told him where it was, the date and the time, and then that's when he blocked me on Messenger. He blocked me and said that's not his baby and that he don't want anything to [do] with it and then he blocked me." As the trial court found, Father knew of the pregnancy in June 2016 and testified at trial that he immediately believed he was the biological father of the Child.

We therefore conclude that the evidence preponderates in favor of the trial court's finding by clear and convincing evidence that Father abandoned the Child by willfully failing to visit Mother during the Prenatal Determinative Period. The trial court did not err in terminating Father's parental rights to the Child on this ground as well.

### 4. Willful Failure to Support Mother Preceding the Child's Birth

Pursuant to Tennessee Code Annotated § 36-1-102(1)(A)(iii) and as alleged in the Second Petition, the trial court also determined that Father had abandoned the Child by willfully failing to financially support Mother in the four months preceding the Child's birth. As with the failure to visit prior to the Child's birth, the applicable version of the statute further provided that "[a] biological or legal father" may be found to have abandoned the Child when he has "willfully failed to make reasonable payments toward the support of the child's mother during the four (4) months immediately preceding the birth of the child." *See* Tenn. Code Ann. § 36-1-102(1)(A)(iii) (2017). The Prenatal Determinative Period (October 1, 2016, through January 30, 2017) is therefore the relevant time period for this statutory ground as well.

As noted in the preceding section of this Opinion, Father's sole visit with Mother during her pregnancy occurred when he took her shopping at Walmart and brought her back to his home to stay overnight in September 2016. The trial court found that Father "purchased prenatal vitamins" for Mother on that occasion and that Mother "did not receive any other financial support from [Father] during her pregnancy." The trial court further found that "financial support or gifts provided to [Mother] during her pregnancy by [Father] are token in nature." It is also undisputed that Father purchased some food items for Mother during the September 2016 trip to Walmart, although Father's and Mother's respective testimonies differ concerning the types of food items. Father does not dispute that he did not provide any additional financial support to Mother prior to the

Child's birth other than the items he purchased for her in September 2016. Considering our earlier determination that this sole visit with Mother during her pregnancy occurred prior to the beginning of the Prenatal Determinative Period, we conclude that Father's purchase of the vitamins and food items for Mother likewise occurred prior to the beginning of the operative statutory period.

Moreover, we conclude that the evidence preponderates in favor of the trial court's finding that Father's failure to provide reasonable payments toward Mother's support during the Prenatal Determinative Period was willful. Although Father testified that Mother had disappeared "off radar" for a period of time prior to the Child's birth, Mother testified that Father changed his telephone number after the September 2016 visit and subsequently blocked her on "Messenger" when she invited him to a prenatal medical appointment in December 2016. Father presented no specific testimony and no other proof of any efforts to contact Mother between September 2016 and the birth of the Child. The trial court credited Mother's testimony that Father knew where to find her and how to reach her during her pregnancy. We emphasize again that the trial court's credibility determinations are entitled to great weight on appeal. *See Jones*, 92 S.W.3d at 838.

We conclude that the trial court did not err in finding clear and convincing evidence that Father abandoned the Child by willfully failing to support Mother during the Prenatal Determinative Period. In determining that the trial court did not err in terminating Father's parental rights to the Child upon all four of the alleged abandonment grounds, we emphasize that as Tennessee Code Annotated § 36-1-102(1)(G) expressly provides, "it shall not be required that a parent be shown to have evinced a settled purpose to forego all parental rights and responsibilities in order for a determination of abandonment to be made."

### B. Statutory Grounds Applicable to Putative Father

The trial court also terminated Father's parental rights to the Child based upon six grounds applicable to a putative father. At the time of each petition's filing, Tennessee Code Annotated § 36-1-113(g)(9) (2017) provided in pertinent part:

(A)  The parental rights of any person who, <u>at the time of the filing of a petition to terminate the parental rights of such person</u>, or if no such petition is filed, at the time of the filing of a petition to adopt a child, is the putative father of the child may also be terminated based upon any one (1) or more of the following additional grounds:

(i)     The person has failed, without good cause or excuse, to pay a reasonable share of prenatal, natal, and postnatal expenses involving the birth of the child in accordance with the person's financial means promptly upon the person's receipt of notice of the child's impending birth;

(ii)    The person has failed, without good cause or excuse, to make reasonable and consistent payments for the support of the child in accordance with the child support guidelines promulgated by the department pursuant to § 36-5-101;

(iii)   The person has failed to seek reasonable visitation with the child, and if visitation has been granted, has failed to visit altogether, or has engaged in only token visitation, as defined in § 36-1-102;

(iv)    The person has failed to manifest an ability and willingness to assume legal and physical custody of the child;

(v)     Placing custody of the child in the person's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child; or

(vi)    The person has failed to file a petition to establish paternity of the child within thirty (30) days after notice of alleged paternity, or as required in § 36-2-318(j), or after making a claim of paternity pursuant to § 36-1-117(c)(3)[.]

(Emphasis added.)[8]

In reviewing the trial court's application of these statutory grounds, we must first determine whether Father was a putative father at the time of each petition's filing. *See id.*; *In re E.C.*, No. E2016-02582-COA-R3-PT, 2017 WL 2438574, at 6 (Tenn. Ct. App. June 6, 2017). At the time of each petition's filing, Tennessee Code Annotated 36-1-102(43) (2017) defined a putative father as

---

[8] Tennessee Code Annotated § 36-1-113(g)(9)(A)(i) (2017), which was alleged by Petitioners and found as proven by the trial court, has since been deleted from the statute. *See* 2019 Tenn. Pub. Acts, Ch. 36, § 3 (S.B. 208), eff. July 1, 2019. Because the subsection providing for this ground was in effect at the time that Petitioners filed the Second Petition, its subsequent deletion from the statute does not affect application of the ground in this case.

a biological or alleged biological father of a child who, at the time of the filing of a petition to terminate the parental rights of such person, or, if no such petition is filed, at the time of the filing of a petition to adopt a child, meets at least one (1) of the criteria set out in § 36-1-117(c) and is not a legal parent[.][9]

The version of Tennessee Code Annotated § 36-1-117(c) (2017) in effect at the time of each petition's filing provided in relevant part:[10]

The parental rights of the putative father of a child who has not filed a petition to establish paternity of the child or who has not established paternity of the child who is the subject of an adoption proceeding and who meets any of the following criteria shall be terminated by surrender, parental consent, termination of parental rights pursuant to § 36-1-113, or by waiver of interest, before the court may enter an order of adoption concerning that child:

* * *

(2)     The biological father has been specifically identified to the petitioners or their attorney, or to the department, the licensed child-placing agency, or the licensed clinical social worker involved in the care, placement, supervision, or study of the child as the child's father by the child's biological mother in a sworn, written statement or by other information that the court determines to be credible and reliable; [or]

(3)     The biological father has claimed to the child's biological mother, or to the petitioners or their attorney, or to the department, a licensed child-placing agency, or a licensed clinical social worker who or that is involved in the care, placement, supervision, or study of the child that the biological father believes that the biological father is the father of the child; provided, that if the biological father has

---

[9] Effective July 1, 2019, the General Assembly has recodified the definition of "putative father" so that it is now found at Tennessee Code Annotated § 36-1-102(44) and amended the subsection to add that a putative father must not have been previously excluded as the biological father of the child by DNA testing. *See* 2019 Tenn. Pub. Acts, Ch. 36, §§ 23, 31 (S.B. 208).

[10] The General Assembly has since deleted Tennessee Code Annotated § 36-1-117(c)(2). *See* 2018 Tenn. Pub. Acts, Ch. 875, § 20 (H.B. 1856), eff. July 1, 2018.

previously notified the department of the biological father's claim to paternity of the child pursuant to the putative father registry, § 36-2-318(e)(3), the biological father shall be subject to all the requirements for waiver of notice provisions of § 36-2-318(f)(2) and to all requirements for filing a paternity petition[.]

In its final order, the trial court found that Father was "the biological father of [the Child]," noting that the parties had stipulated to the fact that Father was the biological father at the opening of the termination trial. However, although the trial court's application of these grounds indicates that the trial court impliedly found Father to be a putative father, the trial court did not expressly find that Father fit the statutory definition. We note that Father did not dispute before the trial court and has not disputed on appeal the trial court's implied finding in this regard.

Testimony demonstrated that Mother had specifically identified Father as the biological father of the Child to Hannah's Hope when she placed the Child in the agency's care, and in turn Petitioners' care, prior to surrendering the Child. Therefore, Father was a putative father, pursuant to Tennessee Code Annotated, § 36-1-117(c)(2) (2017), at the time of the First Petition's filing on September 19, 2017. By the time of the filing of the Second Petition on May 7, 2018, Father had also filed a parentage petition in the juvenile court and had claimed to Hannah's Hope that he was the Child's biological Father. *See* Tenn. Code Ann. § 36-1-117(c)(3). Father therefore qualified as a putative father at the time of both petitions' filings unless he had become a legal father prior to May 7, 2018.

As potentially applicable to Father, the statutory definition of a "legal parent" provides:

A man who has been adjudicated to be the legal father of the child by any court or administrative body of this state or any other state or territory or foreign country or who has signed, pursuant to §§ 24-7-113, 68-3-203(g), 68-3-302, or 68-3-305(b), an unrevoked and sworn acknowledgment of paternity under Tennessee law, or who has signed such a sworn acknowledgment pursuant to the law of any other state, territory, or foreign country[.]

Tenn. Code Ann. § 36-1-102(28)(A)(iv) (2017).[11] Tennessee Code Annotated § 24-7-113(a) (2017) further provides that "[a] voluntary acknowledgment of paternity" "shall

---

[11] Effective July 1, 2019, the General Assembly has recodified the definition of "legal parent" so that it is now found at Tennessee Code Annotated § 36-1-102(29). *See* 2019 Tenn. Pub. Acts, Ch. 36, § 31 (S.B. 208).

constitute a legal finding of paternity" when it is "completed under § 68-3-203(g), § 68-3-302, or § 68-3-305(b)," each of which requires the signatures of both parents in varying situations.

The trial court entered its order adjudicating Father to be the legal father of the Child on June 9, 2020. Prior to entry of this parentage order, Father would have had to sign an unrevoked and sworn acknowledgment of paternity under Tennessee law to be established as a legal father. *See id.* This he did not do. Father testified that he had gone to the health department to attempt to sign the Child's birth certificate, that he had been told Mother must accompany him, and that Mother had refused to do so. Mother denied, however, that Father had ever made such a request. The trial court in its memorandum opinion on grounds specifically found Father's testimony concerning an attempt to "put [his] name on the child's birth certificate, to voluntarily sign an affidavit" not to be credible. In any case, Father did not successfully complete a sworn acknowledgment qualifying him as a legal parent prior to the filing of either petition.

We conclude that Father was a putative father at the time of filing for both the First Petition and the Second Petition. *See* Tenn. Code Ann. § 36-1-102(28)(B) (2017) ("A man shall not be a legal parent of a child based solely on blood, genetic, or DNA testing determining that he is the biological parent of the child without either a court order or voluntary acknowledgement of paternity pursuant to § 24-7-113."). The trial court properly applied the grounds for termination of parental rights provided in Tennessee Code Annotated § 36-1-113(g)(9)(A) to Father. *See, e.g., In re London B.*, No. M2019-00714-COA-R3-PT, 2020 WL 1867364, at *5 (Tenn. Ct. App. Apr. 14, 2020) (explaining that because "there [was] no dispute that Father [was] the biological parent of the child" but "he [had] not been established as a legal parent," "grounds applicable to both parents generally and putative fathers specifically [were] appropriate"). As this Court has noted, "[t]hese grounds [provided in section § 36-1-113(g)(9)(A)] are less difficult to prove than the grounds in Tenn[essee] Code Ann[otated section] 36-1-113(g)(1)-(8) . . . partially because they do not include a willfulness requirement." *In re E.C.*, 2017 WL 2438574, at *8 (quoting *In re H.A.L.*, No. M2005-00045-COA-R3-PT, 2005 WL 954866, at *9 (Tenn. Ct. App. Apr. 25, 2005)). We will now address whether each of the § 36-1-113(g)(9)(A) grounds found by the trial court was proven by clear and convincing evidence.

### 1. Failure to Pay Expenses Related to the Child's Birth

The trial court found clear and convincing evidence that Father's parental rights to the Child should be terminated based on the statutory ground then set forth in Tennessee Code Annotated § 36-1-113(g)(9)(A)(i) (2017), which provided:

The person has failed, without good cause or excuse, to pay a reasonable share of prenatal, natal, and postnatal expenses involving the birth of the child in accordance with the person's financial means promptly upon the person's receipt of notice of the child's impending birth[.]

This ground was alleged solely in the Second Petition.

Having previously determined that Father abandoned the Child by willfully failing to support Mother during the Prenatal Determinative Period, pursuant to Tennessee Code Annotated § 36-1-102(1)(A)(iii), we further determine that the evidence preponderates in favor of the trial court's finding by clear and convincing evidence that Father failed, without good cause or excuse, to pay a reasonable share of prenatal, natal, and postnatal expenses involving the birth of the Child. We emphasize that the requirement of "without good cause or excuse" is a lower standard of culpability than the willfulness required for the statutory abandonment ground of failure to support. *See In re E.C.*, 2017 WL 2438574, at *8.

Father was notified of Mother's pregnancy in June 2016, and, as noted in a previous section of this Opinion, we agree with the trial court's finding that Father's one-time contribution during Mother's pregnancy in the form of prenatal vitamins and some food items purchased in September 2016 was token in nature given Father's financial means. The trial court did not err in terminating Father's parental rights upon this statutory ground.

2. Failure to Make Reasonable and Consistent Payments for the Child's Support

The trial court also found clear and convincing evidence that Father's parental rights to the Child should be terminated based on the statutory ground set forth in Tennessee Code Annotated § 36-1-113(g)(9)(A)(ii), which provides:

The person has failed, without good cause or excuse, to make reasonable and consistent payments for the support of the child in accordance with the child support guidelines promulgated by the department pursuant to § 36-5-101[.]

This ground was alleged in both termination petitions. In its final order, the trial court found generally that Father had "not financially supported [the Child] on a consistent or substantial basis and the money offered for [the Child's] support was not reasonable for support of a child." The trial court also found that "[n]o proof was offered to show that [Father] made monthly support payments consistent with the child support guidelines."

As in his argument concerning the abandonment ground involving willful failure to financially support the Child, *see* Tenn. Code Ann. 36-1-102(1)(A)(i), Father argues as to this ground that he "made support payments via money order to [Hannah's Hope] for his child" and that he "provided necessaries, i.e. wipes, diapers, clothing, shoes, food for the child, and gifts (toys) for birthdays/holidays." Father makes no distinction regarding the time period relevant to this statutory ground, and we note that, as in our prior analysis concerning the abandonment grounds, all but one of the money orders and the majority of the other items supplied by Father were provided after the filing of the Second Petition. For their part, Appellees assert in some detail that Father failed to provide more than token support for the Child during the First, Second, and Prenatal Determinative Periods. However, they do not articulate a specific argument relevant to this ground other than to include the statutory language contained in § 36-1-113(g)(9)(A)(ii) in their overall argument related to support grounds.

We have previously determined in an earlier section of this Opinion that the evidence preponderated in favor of the trial court's finding by clear and convincing evidence that Father failed to provide more than token financial support for the Child during the First and Second Determinative Periods prior to the filing of each petition. Regarding the time period after the filing of the Second Petition, we must conclude, however, that given Father's financial status, including his dependence on disability benefits and intermittent "odd jobs," the money orders he provided to Hannah's Hope approximated reasonable support payments much more closely than his earlier efforts.

As the trial court found, the records kept by Hannah's Hope demonstrated that Father had "provided a total amount of $652.00 in financial support for [the Child] to Hannah's Hope." Father paid this monetary support through money orders ranging in value from $15 to $50. Although Father did not provide a money order each month, he sometimes supplied two or three in one month, and he testified that he sought to catch up on what he thought of as support payments if he had missed one. Father also provided two $20 money orders specifically earmarked for the Child's hair care, and he regularly brought small items for the Child to his visits.

In its memorandum opinion regarding statutory grounds, the trial court, while finding that Father's testimony regarding his income and expenses was not credible, also noted that it found "some of the holes" in the proof concerning Father's income to be "problematic." We agree with this concern. Moreover, considering the totality of the evidence presented regarding Father's income, we determine that the evidence preponderates against the trial court's finding that Father's efforts to support the Child after the filing of the Second Petition were token. *See, e.g.*, *In re Evella S.*, No. M2019-02075-COA-R3-PT, 2021 WL 2588395, at *5 (Tenn. Ct. App. June 24, 2021) (determining that for purposes of the abandonment support ground, the mother's "two

$100 payments during the relevant time period" were not token when the mother "earned $800 biweekly" and "most of that income was used to pay her monthly expenses"); *In re Stormie M.*, No. M2015-02336-COA-R3-PT, 2016 WL 5025999, at *11 (Tenn. Ct. App. Sept. 15, 2016) ("[I]t is not clear to us that the support provided by Mother was insignificant given her available resources.").

As to whether Father's child support payments subsequent to the Second Petition's filing were reasonable and consistent pursuant to the child support guidelines, the trial court correctly noted in its memorandum opinion regarding best interest that because Father's only recorded income came from his SSI benefits, "there would be no order saying that he's required to pay X number of dollars from that money to support the child." *See Tenn. Dep't of Human Servs., ex rel. Young*, 802 S.W.2d at 599. Appellees contend that based on child support worksheets they presented at trial, attempting to provide an income-shares analysis based on Father's income and an estimation of Mother's income based on her testimony concerning what she was currently earning at the time of trial (despite Mother's having surrendered her parental rights by that time), Father should have been paying "between $190.00 per month and $205.00 per month in child support pursuant to the child support guidelines[.]"

Appellees' argument is without merit in this regard. The trial court allowed these worksheets to be presented, but as the court noted, the estimates in the worksheets were not predicated on the real circumstances here, and Father's SSI benefits would not be considered for court-ordered child support. Likewise, Father's testimony, noted by the trial court, that a sufficient amount to pay for child support would have been $140 monthly was not based on the child support guidelines. We conclude that Appellees did not present clear and convincing evidence that Father's child support payments made after the filing of the Second Petition were unreasonable and inconsistent under the child support guidelines.

Upon careful review of the statutory scheme and given the specific facts of this case, we find that the dispositive question for this ground is whether a putative father can repent of his failure to financially support the Child prior to the filing of a termination petition through his increased contributions to the Child's support made after the filing of the petition. Although some argument was presented at trial that only Father's efforts made prior to the filing of each respective petition should be considered, the parties have not addressed this question on appeal. Moreover, we determine that this specific question as to statutory grounds applicable to putative fathers appears to be a matter of first impression in Tennessee.

Resolution of this issue therefore depends in part on statutory interpretation, which is a question of law that we review *de novo* with no presumption of correctness. *See In re*

*Estate of Tanner*, 295 S.W.3d 610, 613 (Tenn. 2009). In the context of interpreting Tennessee Code Annotated § 36-1-113, our Supreme Court has set forth the following principles:

> This statute, which is part of Tennessee's adoption law, must be strictly construed because it is in derogation of the common law. *See In re K.A.Y.*, 80 S.W.3d 19, 23 (Tenn. Ct. App. 2002). When construing a statute, this Court's role is "'to ascertain and give effect to the legislative intent without unduly restricting or expanding a statute's coverage beyond its intended scope.'" *Houghton v. Aramark Educ. Res., Inc.*, 90 S.W.3d 676, 678 (Tenn. 2002) (quoting *Owens v. State*, 908 S.W.2d 923, 926 (Tenn. 1995)). Legislative intent is determined "from the natural and ordinary meaning of the statutory language within the context of the entire statute without any forced or subtle construction that would extend or limit the statute's meaning." *State v. Flemming,* 19 S.W.3d 195, 197 (Tenn. 2000). "When the statutory language is clear and unambiguous, we apply the plain language in its normal and accepted use." *Boarman v. Jaynes,* 109 S.W.3d 286, 291 (Tenn. 2003).

*Osborn v. Marr*, 127 S.W.3d 737, 740 (Tenn. 2004).

Within the statutory definition of abandonment, Tennessee Code Annotated § 36-1-102(1)(F) provides that "[a]bandonment may not be repented of by resuming visitation or support subsequent to the filing of any petition seeking to terminate parental or guardianship rights or seeking the adoption of a child[.]" As noted in the previous section of this Opinion addressing abandonment through willful failure to support, this provision precludes consideration for the abandonment support ground of a parent's resumed or increased efforts to support a child after the determinative period four months preceding the filing of the termination petition. *See* Tenn. Code Ann. § 36-1-102(1)(A)(i). However, the language of the statutory ground applicable to putative fathers provided in Tennessee Code Annotated § 36-1-113(g)(9)(A)(ii), stating that a putative father's parental rights may be terminated who, "without good cause or excuse," fails "to make reasonable and consistent payments for the support of the child in accordance with the child support guidelines," does not include a specified time period.

We also find instructive application of the statutory interpretative maxim of *expressio unius est exclusio alterius*, "which holds that the expression of one thing implies the exclusion of others," *see Rich v. Tenn. Bd. of Med. Exam'rs*, 350 S.W.3d 919, 928 (Tenn. 2011). Here, the legislature has clearly provided a time period to be considered and excluded the possibility of repentance in the abandonment definition concerning support while providing neither a time period nor the exclusion of repentance

in the support ground applicable to putative fathers. By comparison, another of the grounds applicable to putative fathers, Tennessee Code Annotated § 36-1-113(g)(9)(A)(vi), does include a set amount of time in which a putative father must take action to file a petition to establish parentage after he receives notice of alleged paternity.

Interpreting the plain language of Tennessee Code Annotated § 36-1-113(g)(9)(A)(ii) within the context of the entire statute, we hold that it does not include a prohibition on a putative father's ability to repent of his failure to reasonably and consistently support his child after the filing of the termination petition. Having determined that clear and convincing evidence did not support a finding that Father's child support payments made after the filing of the Second Petition were inconsistent and unreasonable in accordance with the child support guidelines, we reverse the trial court's conclusion as to this ground.

### 3. Failure to Visit the Child

The trial court further found that Father's parental rights to the Child should be terminated pursuant to Tennessee Code Annotated § 36-1-113(g)(9)(A)(iii), which provides:

> The person has failed to seek reasonable visitation with the child, and if visitation has been granted, has failed to visit altogether, or has engaged in only token visitation, as defined in § 36-1-102[.]

To reiterate, token visitation is "perfunctory visitation or visitation of such an infrequent nature or of such short duration as to merely establish minimal or insubstantial contact with the child." Tenn. Code Ann. § 36-1-102(1)(C). This ground was alleged solely in the First Petition, filed in September 2017. Father undisputedly did not file a petition seeking visitation with the Child until January 2018.

In its final order, the trial court found that the majority of Father's visits with the Child occurred "outside the relevant four-month time period[s] for both petitions." As to the number of visits, the trial court specifically found in pertinent part:

> This Court heard testimony from Reverend Katrina Morrison, the director of Hannah's Hope, and Ms. Susan Prince, the case worker/social worker employed by Hannah's Hope and found their testimony to be credible. Hannah's Hope supervised all visits and Ms. Prince is the Hannah's Hope employee that supervised almost all of the visits in accordance with records that were maintained of [Father's] contact with Hannah's Hope, including his arrival and departure times.

Since being awarded supervised visitation with [the Child] on February 16, 2018, [Father] had the opportunity to visit [the Child] on 154 occasions at the offices of Hannah's Hope. However, he only attended 73 visits. [Father] was often late or terminated the visits early. He failed to confirm visits in advance even though he was required to do so if he intended to exercise a visit and confirmation took little effort.

(Paragraph numbering omitted.) We note that Reverend Morrison actually testified that Father attended 96 of the 154 visits. She did testify, however, that Father exercised only 73 "full" visits when he did not arrive late and/or leave early. The trial court also credited Ms. Prince's testimony that Father often failed to fully engage with the Child during visits, utilizing videos on his cellular telephone to entertain the Child and eating separately from the Child at times.

On appeal, Father does not dispute the number of visits credited by the trial court. He argues, however, that his attempts to visit were thwarted either by Mother's "disappear[ance]" prior to the filing of the First Petition or subsequently by Petitioners' various motions to stay visitation. Having determined that Mother did not prevent Father from visiting the Child during the First Determinative Period and noting that the trial court did not include any court-ordered stays of visitation in its calculation of the visits available to Father, we find these arguments unavailing.

Father does subsequently include in his argument concerning best interest a potentially more compelling assertion that his at least 73 visits with the Child between the chancery court's February 2018 visitation order and the time of the best interest portion of trial in September 2019 represented a real attempt on his part to maintain regular visitation with the Child. Although the trial court negatively critiqued the quality of these visits in terms of Father's efforts to build a meaningful relationship with the Child, we are unable to conclude that Father's 73 full visits and additional 23 partial visits within approximately one and one-half years constituted only token visitation. *See, e.g.*, *In re Azariah R.*, No. E2020-01034-COA-R3-PT, 2021 WL 241745, at *10 (Tenn. Ct. App. Jan. 25, 2021) (reversing the trial court's finding that the mother's visitation was token when she attended slightly less than half of the visits she could have enjoyed if she had remembered "to confirm visits in advance as required" and the trial court's analysis focused on the quality of the visits in finding them to be token); *In re Karissa V.*, No. E2016-00395-COA-R3-PT, 2017 WL 758513, at *13 (Tenn. Ct. App. Feb. 27, 2017) (noting an acknowledged correction in a petitioner's testimony that the mother had actually visited the child 43 or 44 times rather than 17 and determining that "even if we went with the lower figure of 17 visits in the relevant four-month period . . . we would be hard-pressed to deem that token visitation").

Therefore, as with the statutory ground applicable to putative fathers addressed in the preceding section of this Opinion, we determine that the dispositive issue as to this ground is whether Father could repent of his failure to visit prior to the filing of the termination petition, in this instance the First Petition, through his subsequent efforts to visit the Child. For the same reasons provided in the preceding section and interpreting the plain language of Tennessee Code Annotated § 36-1-113(g)(9)(A)(iii) within the context of the entire statute, we hold that this subsection does not include a prohibition on a putative father's ability to repent of his failure to seek visitation or exercise more than token visitation after the filing of the termination petition.[12] Having determined that clear and convincing evidence did not support a finding that Father failed to exercise more than token visitation after the filing of the First Petition, we reverse the trial court's conclusion as to this ground as well.

4. Failure to Manifest an Ability and Willingness to Assume Custody

Alleged in both petitions, Tennessee Code Annotated § 36-1-113(g)(9)(A)(iv) provides as an additional ground for termination of parental rights applicable to putative fathers that "[t]he person has failed to manifest an ability and willingness to assume legal and physical custody of the child." In finding that this ground had been proven by clear and convincing evidence in its final order, the trial court made a conclusory statement to this effect in its conclusions of law. However, in its factual findings, the trial court additionally found that "[t]here is no proof that [Father] is in a position to take care and custody of [the Child]." In its incorporated memorandum opinion concerning statutory grounds, the trial court further found that although Father had testified that he was ready to care for the Child and would provide for her needs, "[t]here was no proof that [Father], on any consistent basis or to any reasonable degree, provided care or support or offered [himself] as a custodian of this child such that a court would believe that [he is] in a position and a posture to take the care and custody of this young child."

In his argument in opposition to this ground, Father relies solely on the filing of his answer to the termination petition filed by Hannah's Hope and his filing of a petition to establish parentage as support for his argument that he had manifested an ability and

---

[12] In so holding, we note that our research has revealed decisions in which this Court, without directly addressing the question of post-petition repentance and in situations when no such repentance had been demonstrated, has included a putative father's behavior up to the time of trial in determining under Tennessee Code Annotated § 36-1-113(g)(9)(A)(iii) that the father had failed to seek reasonable visitation or engage in more than token visitation. *See In re London B.*, 2020 WL 1867364, at *10 (affirming the ground of failure to visit applicable to a putative father and stating that "by the time of the termination trial, he had exercised no visitation with the child in approximately five years"); *In re Rilyn S.*, No. E2018-00027-COA-R3-PT, 2019 WL 1130442, at *7 (Tenn. Ct. App. Mar, 12, 2019) ("Father stipulated and testified that he never requested a visit with [the child].").

willingness to assume legal and physical custody of the Child. We note that although both of these acts occurred after the filing of the First Petition, they did occur prior to the filing of the Second Petition and can be said to evince a willingness on Father's part to assume legal and physical custody of the Child. Whether Father's other actions—such as taking advantage of what the trial court found to be sixty-three percent of the visits with the Child available to him after visitation was granted, providing only token support during the Second Determinative Period, and increasing his payments only sporadically in subsequent months—evince true willingness to assume custody is arguable. It is well established that a parent's actions can demonstrate a lack of willingness to assume custody of or financial responsibility for the child. *See In re Keilyn O.*, No. M2017-02386-COA-R3-PT, 2018 WL 3208151, at *8 (Tenn. Ct. App. June 28, 2018); *In re Amynn K.*, No. E2017-01866-COA-R3-PT, 2018 WL 3058280, at *15 (Tenn. Ct. App. June 20, 2018).

Even assuming, *arguendo*, that Father has demonstrated the <u>willingness</u> to assume legal and physical custody of the Child, we must agree with the trial court that Father has failed to manifest the <u>ability</u> to assume legal and physical custody. Our Supreme Court has recently noted the "nearly identical" language between this statutory ground applicable to putative fathers and the first prong of the statutory ground provided in Tennessee Code Annotated § 36-1-113(g)(14). *See In re Neveah M.*, 614 S.W.3d 659, 677 (Tenn. 2020). In holding that § 36-1-113(g)(14) "places a conjunctive obligation on a parent or guardian to manifest both an ability and willingness to personally assume legal and physical custody or financial responsibility for the child," the High Court cited with approval its earlier discussion in *In re Bernard T.* of the same statutory language in § 36-1-113(g)(9)(A)(iv):

> Although our discussion of this language was not dispositive of the <u>In re Bernard T.</u> appeal, this Court affirmed termination of parental rights where the father had "manifested a commendable willingness to assume legal custody of all the children" but "conceded that he was unable to support the children financially and that he could not provide them with a stable residence." 319 S.W.3d at 604. We concluded that the father's "testimony alone provide[d] clear and convincing evidence that [the father] [did] not presently have the ability to assume legal and physical custody of any of the children." *Id.* at 604-05.

*In re Neveah M.*, 614 S.W.3d at 677. Therefore, in order to establish this ground for termination of Father's parental rights to the Child, Petitioners were required to prove that Father had failed to manifest either the willingness or the ability to assume legal and physical custody of the Child. *See id.*

As this Court has explained in analyzing this ground applicable to a putative father:

> As to this ground, courts consider whether a father is in a position to care for the child. *See In re E.C.*, No. E2016-02582-COA-R3-PT, 2017 WL 2438574, at *8 (Tenn. Ct. App. June 6, 2017). A court looks at the father's actions, not his expressions of intention. *Id.* (citing *In re Weston T.R.*, No. M2012-00580-COA-R3-PT, 2012 WL 3804414, at *7 (Tenn. Ct. App. Aug. 31, 2012)). In *In re E.C.*, the court determined that the father's actions in violating house arrest, which resulted in his re-incarceration, evidenced "an unwillingness to act in a way that would allow him to assume custody of the child." *Id.* The Supreme Court in *In re Bernard T.*, 319 S.W.3d 586, 604-05 (Tenn. 2010), found clear and convincing evidence of the father's lack of ability to assume legal and physical custody of his children when the father "conceded that he was unable to support the children financially and that he could not provide them with a stable residence." In the case of *In re Adoption of S.T.D.*, the court considered the father's actions with respect to his other three children who were not subjects of the appeal. *In re Adoption of S.T.D.*, 2007 WL 3171034, at *8. The father testified that he had never paid child support to these children's mothers. *Id.* At the time of trial, one child was living with the stepmother, who testified that the father "has never checked on that child and has never offered her any child support." *Id.* The court determined that the father had not manifested the ability to assume legal and physical custody of the children. *Id.*

*In re Rilyn S.*, No. E2018-00027-COA-R3-PT, 2019 WL 1130442, at *8 (Tenn. Ct. App. Mar. 12, 2019).

In its memorandum opinion concerning statutory grounds, the trial court, in finding that Father had failed to provide reasonable support for the Child or show that he would be able to do so, addressed Father in stating:

> [T]he Court finds that, [Father], you are – you're not 18, you're not 17. You're the father of somewhere between five to nine children. You should be held to a standard somewhat different from a 17- or an 18-year-old when it comes to having knowledge of what's required to care for children, and I don't find that you've met any of those standards or tests in terms of ensuring that a child has an opportunity to be supported by a person who knows he or she is the parent and that that child has to eat every day, has to have clothing every day, has to have housing every day, and it is not the

- 39 -

responsibility of a non-parent to do that, and it's not the total responsibility of the other biological parent, and it appears, [Father], that you're in the business of fathering children, and, based on your own testimony, it does not appear that you are in the business of ensuring that those children are cared for. I heard the testimony [by Father] that you do for your children whatever they need, but there was no proof that you do for your children whatever they need. There was no proof that you, on any consistent basis or to any reasonable degree, provided care or support or offered yourself as a custodian of this child such that a court would believe that you are in a position and a posture to take the care and custody of this young child.

Upon thorough review of the record, we determine that the evidence preponderates in favor of the trial court's findings. The trial court found Father's testimony concerning his income and expenses, including support Father claimed to have paid for his other minor children, not to be credible. When questioned during the portion of trial on statutory grounds regarding whether he had made support payments for his other minor children, Father stated that he had done so through "Western Union or MoneyGram," but he did not produce any receipts for those payments at trial despite discovery requests from Hannah's Hope and Petitioners.[13] Although the exhibit is not in the appellate record, the transcript from the best interest phase of trial indicates that Father at that time presented receipts for three money orders that he had recently sent to mothers of two of his other minor children. Even considering this late-offered proof, however, Father did not effectively refute Appellees' allegations that he had not consistently or reasonably supported his other minor children, particularly considering the trial court's credibility determination as to Father in this regard.

Father and Paternal Grandmother each respectively testified that Father had cared for one of his sons during that child's infancy, that one of Father's other daughters had stayed with him and Paternal Grandmother over the previous summer, and that Father's adult son had first come to live with Father and Paternal Grandmother when he was in his last year of high school. Father also testified that he often spent Sundays with two of his other minor daughters. However, Father acknowledged during the best interest phase of trial that for each of his other minor children besides the Child, the respective mother "currently holds custody of them."

Moreover, as the trial court noted in its memorandum opinion concerning the best interest analysis, also incorporated into the final order, Father, by his own testimony, was relying on assistance from Paternal Grandmother in the event that he obtained custody of

---

[13] Testimony indicated that when he was deposed by Hannah's Hope prior to trial, Father had provided a copy of one payment made to A.G. through Western Union, which was not presented at trial and is not in the record.

the Child. Paternal Grandmother, who acknowledged that she had never met the Child, testified that the Child would be like her own and that "it wouldn't even be a problem" to have the Child in her home. Although Paternal Grandmother opined that Father was capable of caring for the Child on his own, she acknowledged that she was the representative payee of his disability benefits and that Father did not have his own place to live, having resided with her for approximately three years at the time of trial. *See, e.g.*, *In re F.N.M.*, No. M2015-00519-COA-R3-PT, 2016 WL 3126077, at *9-10 (Tenn. Ct. App. Apr. 11, 2016) (affirming the trial court's termination of the father's parental rights on this ground when the father had arguably demonstrated willingness to take custody of the child but had "been reliant on others for basic living expenses," had a questionable work history, did not drive due to a suspended license, and "admitted that he would need some help and support from others to care for the child if he were to be given custody").

Considering Father's "actions," rather than "his expressions of intention," we conclude that Father was not "in a position to care for the Child." *See In re Rilyn S.*, 2019 WL 1130442, at *8. The trial court did not err in terminating Father's parental rights upon its finding by clear and convincing evidence that as a putative father, he had failed to manifest an ability and willingness to assume legal and physical custody of the Child.

### 5. Risk of Substantial Harm to the Child

The trial court also found clear and convincing evidence of the statutory ground set forth in Tennessee Code Annotated § 36-1-113(g)(9)(A)(v), which provides:

> Placing custody of the child in the person's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child[.]

This ground was alleged solely in the Second Petition. As a conclusion of law in its final order, the trial court stated that "placing custody of the child in the legal and physical custody of [Father] would pose a risk of substantial harm to the physical or psychological welfare of the child." Although not raised as an issue by Father, we note that the trial court stated that this conclusion was made pursuant to § 36-1-113(g)(9)(A)(iv), rather than § 36-1-113(g)(9)(A)(v). However, inasmuch as Petitioners alleged the ground provided in § 36-1-113(g)(9)(A)(v) in their termination petition and the trial court used the language of this subsection, we determine the misnumbering of the subsection in the final order to be harmless error.

- 41 -

On appeal, Father, without further elaboration, contends that "[t]here is no clear and convincing evidence that placing custody of the child in [Father's] legal and physical custody would pose a risk of substantial harm, to the child." We disagree. As this Court has summarized concerning this ground:

> The caselaw interpreting this provision offers some guidance in its application. In the case of *In re F.N.M.*, No. M2015-00519-COA-R3-PT, 2016 WL 3126077, at *1 (Tenn. Ct. App. Apr. 11, 2016), the putative father filed an emergency petition to establish paternity shortly after the petition to terminate parental rights was filed. This court affirmed the trial court's decision to terminate the father's parental rights under Tenn. Code Ann. § 36-1-113(g)(9)(A)(v) for risk of substantial harm. *In re F.N.M.*, 2016 WL 3126077, at *14. The child had been with the prospective adoptive parents since birth. *Id.* at *12. The trial court credited expert testimony concerning the loving home provided by the prospective adoptive parents, the secure bond between the child and the prospective adoptive parents, and "the adverse psychological and physical effects a child experiences if taken away from the person or persons with whom the child has bonded." *Id.* at *13. Furthermore, the proof established that the putative father had no relationship with the child, "due in large part to his incarceration for almost all of the child's life." *Id. See also State v. C.H.H.*, No. E2001-02107-COA-R3-CV, 2002 WL 1021668, at *9 (Tenn. Ct. App. May 21, 2002) (affirming termination on the ground of substantial harm based on evidence that the child viewed the foster parents as her parents and was attached to her siblings and that the clinical social worker's evaluation of father showed him to have a "callous disregard" for these strong bonds).

*In re Rilyn S.*, 2019 WL 1130442, at *9 (footnote omitted).

In its conclusions of law, the trial court did not further explain its finding as to this ground. However, the trial court made the following specific findings of fact in its final order that we deem to be supportive of its finding that placing the Child in Father's custody would pose a risk of substantial harm to her:

> When [Father] did visit [the Child], he did not appropriately engage with her. He was observed sleeping during at least one visit and supervisors had to intervene to help [the Child] with tasks such as eating because [Father] left her alone. Other than merely showing up for approximately fifty percent (50%) of his visits with [the Child], [Father]

offered no other evidence of any significant step he took to establish a meaningful attachment to [the Child].[14]

[The Child] does not acknowledge [Father] as her father or recall her visits with him. She does, however, refer to [Petitioners] as her parents and runs to meet them when they arrive to pick her up. The testimony reflects that [the Child] was more connected to Ms. Prince than to [Father].

[Mother] had to find multiple caregivers for [the Child] prior to surrendering her parental rights. Hannah's Hope assisted in the transition of [the Child] to the home of [Petitioners]. [Petitioners] have been [the Child's] primary and consistent caregivers for over two years. The testimony from [Katherine B.], which this Court found to be credible, was that she and [Adrian B.] researched and took intentional steps to create a strong and secure relationship with [the Child] when she was placed in their care at the age of seven months. [The Child] also has a strong sibling relationship with their other children.

Hannah's Hope has provided post-placement supervision of [the Child]. [The Child] is well-adjusted in [Petitioners'] home, and they have provided [the Child] with a safe and stable routine. [Petitioners] have made considerable intentional efforts to bond with [the Child] over the past two years, and [the Child] is thriving. [The Child] is healthy, and [Petitioners] obtained speech therapy for [the Child] while in their care.

(Paragraph numbering omitted.) We conclude that the evidence preponderates in favor of the trial court's findings in this regard.

At the time of the trial phase concerning statutory grounds, the Child had been in Petitioners' home for nearly two years. Prior to her placement in Petitioners' home, she had met Father only once when she was three to four months of age. Reverend Morrison testified to the sporadic nature of Father's visits with the Child since the order allowing visitation had been entered by the chancery court in February 2018. During the best interest phase, the trial court heard further testimony from Reverend Morrison, Ms. Prince, and Katherine B. regarding, *inter alia*, the Child's development in Petitioners' home and her relationship with Father during visitation. Reverend Morrison testified that Ms. Prince and she had supervised the majority of the visits between Father and the Child with the office manager for Hannah's Hope occasionally acting as a second supervisor.

---

[14] As noted in a subsequent section of this Opinion, the trial court, in its memorandum opinion regarding best interest, correctly found that Father had exercised sixty-three percent of the full visits with the Child that were available to him.

Reverend Morrison opined that Father had "[n]ot particularly" developed a bond with the Child and was "a playmate with her, perhaps more than a caregiver." She stated that the Child did not refer to Father by name or call to him when he arrived for visits.

Ms. Prince testified that she had supervised eighty-five visits between Father and the Child and that she typed notes regarding each visit immediately upon the visit's conclusion. She stated that when the Child came into the guardianship of Hannah's Hope, she was accustomed to "multiple caregivers, some of inappropriate ages . . . younger children and an older woman," and she experienced "lots of sleep issues." According to Ms. Prince, the Child at that time "didn't fuss or cry about anything, and she didn't – it didn't matter to her who was caregiving her." Ms. Prince further testified that in the care of Petitioners, the Child at the time of trial was "doing fantastic" and was "a happy, well-adjusted, healthy little girl" who had met developmental milestones.

Ms. Prince described the "cocooning" she believed necessary to form a bond with an infant and stated that Petitioners educated themselves regarding how to cocoon with the Child. She reported that when Petitioners were concerned that the Child was not "talking as their other children had," they obtained speech therapy for the Child. When questioned concerning the relationship she had witnessed between the Child and Petitioners, Ms. Prince responded: "It's very typical of a parent and child. [The Child] is, as far as I can see, she is bonded and attached to them. They are her family. These are her siblings." Ms. Prince stated that the Child runs to Petitioners and "gets very excited" when she sees them.

In contrast, Ms. Prince described concerns with Father's visits as noted in the trial court's findings, including his reliance on his cellular telephone to entertain the Child and his failure to open bags for her to eat when she could not open them herself. Ms. Prince testified that during his early visits with the Child, Father did not "seem to have a good sense . . . of what was appropriate for a one-year-old." She stated that with the Child as a two-year-old, Father had difficulty disciplining normal boundary-testing behavior and redirecting behavior. When asked to describe the relationship between Father and the Child, Ms. Prince responded in relevant part:

> I would say they're friends. They have – it's like a play date. You know, they play.
>
> He follows her lead in play until he gets tired, and then he uses videos. You know, he'll tell her now that we have played, I'll reward you with a video. Or sometimes he says we're going to watch videos. I have even heard him say, you're wearing me out. I'm exhausted. So he redirects her with videos, usually.

Ms. Prince further reported that the Child would usually remember to wave "bye-bye" to Father when he left but that his leaving was "not a big blip in her . . . radar that he's coming or going." Ms. Prince testified that on one occasion approximately a year prior to trial, the Child called Father, "daddy," but that the Child had recently learned the word at that time and was "calling men daddy." Ms. Prince stated that she had never heard the Child refer to Father by name.

Katherine B.'s testimony corroborated Ms. Prince's description of "cocooning" and Petitioners' early, intentional efforts to bond with the Child. She further testified that she and her husband have four children in addition to the Child, and she described a strong sibling relationship between the Child and each of the other children. According to Katherine B., the Child had not talked about Father after her visits with him, although she did talk about Ms. Prince.

We recognize that the trial court did not find that the Child was at risk of being physically harmed by Father. Although Mother's testimony indicated that Father had exercised poor judgment in bringing along the toddler son he shared with M.P. when he and M.P. first met Mother and became intimate, no evidence was presented in this case that Father had a history of being abusive toward the Child or anyone else. We also recognize our Supreme Court's holding in *In re Adoption of A.M.H.*, 215 S.W.3d 793, 812 (Tenn. 2007), that "[e]vidence that [the child] will be harmed from a change in custody because she has lived and bonded with the [non-parents] cannot constitute the substantial harm required to prevent the parents from regaining custody" (footnote omitted). However, as this Court noted in *In re F.N.M.*, a distinction exists between the situation in *Adoption of A.M.H.*, wherein the parents had an established bond with the child prior to the child's placement with pre-adoptive parents, which was interrupted by "protracted litigation," and a case such as *F.N.M.*, wherein the father had not established a relationship with the child prior to the child's placement. *In re F.N.M.*, 2016 WL 3126077, at *11 (quoting *In re Adoption of A.M.H.*, 215 S.W.3d at 812).

This case presents a closer call than the situation in *In re F.N.M.* because although Father and the Child had no relationship when the Child was placed with Petitioners at seven months old, Father has made himself known to the Child through visitation that began when the Child was a little over a year of age. However, the evidence preponderates in favor of the trial court's finding that the Child's relationship with Father was more akin to a relationship with an occasional playmate than a parent. The evidence also preponderates in favor of the trial court's finding that the Child had an established bond with Petitioners as her "primary and consistent caregivers for over two years" and an established sibling bond with Petitioners' other children. We note that in *State v. C.H.H.*, 2002 WL 1021668, at *9, this Court affirmed termination of the father's parental

rights on this ground despite the father's having been intermittently in the child's life prior to the child's placement with foster parents when the child had "formed a bond with the foster parents," "[saw] them as parents," and the father had "no regard" for the child's bond with the foster family. In contrast, no evidence has been presented here that Father had particularly disregarded the bond between Petitioners and the Child. However, we discern an important additional element here in that Ms. Prince's testimony indicated that at the time of Mother's surrender, the Child exhibited signs of a lack of bonding with a central caregiver and an atypical response to a change in caregivers. Ms. Prince stated that "it didn't matter to [the Child] who was caregiving her." Testimony further indicated that the Child's demonstrated bond with Petitioners was at least in part due to concerted efforts on Petitioners' part to form the type of caregiver-child bond that the Child had not previously developed. We therefore conclude that the risk of harm to the Child's psychological welfare would be substantial if she were to be taken from Petitioners' care and placed with Father, whom testimony demonstrated the Child did not view as a caretaker or parent figure.

As such, we determine that the trial court did not err in finding by clear and convincing evidence that placement of the Child in Father's legal and physical custody, necessitating removal of the Child from the caregivers with whom she had bonded, would pose a risk of substantial harm to the psychological welfare of the Child. The trial court therefore did not err in terminating Father's parental rights pursuant to this ground.

### 6. Failure to Timely File Petition to Establish Parentage

The final statutory ground applicable to a putative father and found by the trial court to be proven by clear and convincing evidence provides in pertinent part:

> The person has failed to file a petition to establish paternity of the child within thirty (30) days after notice of alleged paternity . . . .

Tenn. Code Ann. § 36-1-113(g)(9)(A)(vi). This ground was alleged in both termination petitions. At the time of the petitions' respective filings, notice was defined within § 36-1-113(g)(9) as follows:[15]

> (B)(i) For purposes of this subdivision (g)(9), "notice" means the written statement to a person who is believed to be the biological father or possible biological father of the child. The notice may be made or given by the mother, the department, a licensed child-placing

---

[15] Effective July 1, 2019, the General Assembly has amended Tennessee Code Annotated § 36-1-113(g)(9)(B)(ii) to add the phrase, "or possible biological father," immediately preceding the last phrase, "of the biological mother's child." *See* 2019 Tenn. Pub. Acts, Ch. 36, § 4 (S.B. 208).

agency, the prospective adoptive parents, a physical custodian of the child, or the legal counsel of any of these people or entities; provided, that actual notice of alleged paternity may be proven to have been given to a person by any means and by any person or entity. The notice may be made or given at any time after the child is conceived and, if not sooner, may include actual notice of a petition to terminate the putative father's parental rights with respect to the child;

(ii)    "Notice" also means the oral statement to an alleged biological father from a biological mother that the alleged biological father is believed to be the biological father of the biological mother's child[.]

The trial court found in its final order that Father had "failed to file a petition to establish paternity of the minor child within thirty (30) days after notice of alleged paternity[.]" Father acknowledged at trial that Mother informed him that she was pregnant with his child in June 2016. The Child was then born in January 2017. Father did not file his petition to establish parentage until January 2018.

On appeal, Father does not refute these facts. Instead, he asserts that his attempt to access the health department in an effort to acknowledge paternity was thwarted by Mother's "disappear[ance]" and that "it is in the interest of justice not to terminate [Father's] parental rights based on this ground." We find these arguments unavailing. Father did not require Mother's assistance to file a petition to establish parentage, as evinced by the fact that he did so without her assistance in January 2018. The trial court did not err in terminating Father's parental rights based upon this statutory ground upon its finding by clear and convincing evidence that Father had failed to file a petition to establish parentage within thirty days after receiving notice of his alleged paternity.

C.  Tennessee Code Annotated § 36-1-113(g)(14)

As a final statutory ground, Petitioners alleged that Father's parental rights to the Child should be terminated under Tennessee Code Annotated § 36-1-113(g)(14) (2017), which at the time of the Second Petition's filing provided:

A legal parent or guardian has failed to manifest, by act or omission, an ability and willingness to personally assume legal and physical custody or financial responsibility of the child, and placing the child in the person's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child.

- 47 -

We note that effective July 1, 2018, the General Assembly amended this subsection to substitute "A parent" in place of "A legal parent." *See* 2018 Tenn. Pub. Acts, Ch. 875, § 12 (H.B. 1856).

The trial court, perhaps as an oversight, did not make a finding specific to this statutory ground. Other than a mention in their appellate brief that the trial court found clear and convincing evidence of "ten (10) of the eleven (11) grounds" alleged, Appellees do not address the trial court's lack of findings as to this ground, and Father does not mention it at all on appeal. We note that the best practice is for the trial court to address all grounds pled in the termination petition. *See In re D.L.B.*, 118 S.W.3d at 367. As our Supreme Court has explained:

> The trial court is required to find only one statutory ground for termination of parental rights. *See* Tenn. Code Ann. § 36-1-113 (2001). However, given the importance of establishing the permanent placement of a child who is the subject of a termination of parental rights proceeding, the trial court should include in its final order findings of fact and conclusions of law with regard to each ground presented. If the trial court addresses each ground that is raised in a termination proceeding, the child's permanent placement will not be unnecessarily delayed due to a remand for findings on alternate grounds.

*Id.*

Nonetheless, because no party has argued that the statutory ground found in Tennessee Code Annotated § 36-1-113(g)(14) should or should not have been found and because the trial court made no finding regarding this ground, the issue of whether the ground applied to Father is not properly before this Court. *See Dorrier v. Dark,* 537 S.W.2d 888, 890 (Tenn. 1976) ("This is a court of appeals and errors, and we are limited in authority to the adjudication of issues that are presented and decided in the trial courts[.]").

## V. Best Interest of the Child

When a parent has been found to be unfit by establishment of at least one statutory ground for termination of parental rights, as here, the interests of parent and child diverge, and the focus shifts to what is in the child's best interest. *In re Audrey S.*, 182 S.W.3d at 877; *see also In re Carrington H.*, 483 S.W.3d at 523 ("The best interests analysis is separate from and subsequent to the determination that there is clear and convincing evidence of grounds for termination." (quoting *In re Angela E.*, 303 S.W.3d 240, (Tenn. 2010))). Tennessee Code Annotated § 36-1-113(i) provides a list of factors

the trial court is to consider when determining if termination of parental rights is in a child's best interest. This list is not exhaustive, and the statute does not require the court to find the existence of every factor before concluding that termination is in a child's best interest. *See In re Carrington H.*, 483 S.W.3d at 523; *In re Audrey S.*, 182 S.W.3d at 878 ("The relevancy and weight to be given each factor depends on the unique facts of each case."). Furthermore, the best interest of a child must be determined from the child's perspective and not the parent's. *White v. Moody*, 171 S.W.3d 187, 194 (Tenn. Ct. App. 2004).

The version of Tennessee Code Annotated § 36-1-113(i) (Supp. 2020) in effect when the petitions were filed in the instant action listed the following factors for consideration:[16]

(1)     Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;

(2)     Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;

(3)     Whether the parent or guardian has maintained regular visitation or other contact with the child;

(4)     Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;

(5)     The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

(6)     Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional

---

[16] Effective April 22, 2021, the General Assembly has amended Tennessee Code Annotated § 36-1-113(i) by deleting the previous subsection in its entirety and substituting a new subsection providing, *inter alia*, twenty factors to be considered in determining a child's best interest in a case involving termination of parental rights. *See* 2021 Tenn. Pub. Acts, Ch. 190 § 1 (S.B. 205). However, because both of the termination petitions in this case were filed prior to the effective date of the amendment, the statutory best interest factors provided in the prior version of the statute are applicable here. *See, e.g.*, *In re Braxton M.*, 531 S.W.3d 708, 732 (Tenn. Ct. App. 2017).

or psychological abuse, or neglect toward the child, or another child or adult in the family or household;

(7)     Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol, controlled substances or controlled substance analogues as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8)     Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9)     Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

As our Supreme Court has explained regarding the best interest analysis:

"The best interests analysis is separate from and subsequent to the determination that there is clear and convincing evidence of grounds for termination." In re Angela E., 303 S.W.3d [240,] 254 [(Tenn. 2010)].

When conducting the best interests analysis, courts must consider nine statutory factors listed in Tennessee Code Annotated section 36-1-113(i). These statutory factors are illustrative, not exclusive, and any party to the termination proceeding is free to offer proof of any other factor relevant to the best interests analysis. In re Carrington H., 483 S.W.3d at 523 (citing In re Audrey S., 182 S.W.3d 838, 878 (Tenn. Ct. App. 2005)). Facts considered in the best interests analysis must be proven by "a preponderance of the evidence, not by clear and convincing evidence." In re Kaliyah S., 455 S.W.3d [533,] 555 [(Tenn. 2015)] (citing In re Audrey S., 182 S.W.3d at 861). "After making the underlying factual findings, the trial court should then consider the combined weight of those facts to determine whether they amount to clear and convincing evidence that termination is in the child's best interest[s]." Id. When considering these statutory factors, courts must remember that "[t]he child's best interests [are] viewed from the child's, rather than the parent's, perspective." In re Audrey S., 182 S.W.3d at 878. Indeed, "[a] focus on the perspective of the

child is the common theme" evident in all of the statutory factors. <u>Id.</u> "[W]hen the best interests of the child and those of the adults are in conflict, such conflict shall always be resolved to favor the rights and the best interests of the child. . . ." Tenn. Code Ann. § 36-1-101(d) (2017).

Ascertaining a child's best interests involves more than a "rote examination" of the statutory factors. <u>In re Audrey S.</u>, 182 S.W.3d at 878. And the best interests analysis consists of more than tallying the number of statutory factors weighing in favor of or against termination. <u>White v. Moody</u>, 171 S.W.3d 187, 193-94 (Tenn. Ct. App. 2004). Rather, the facts and circumstances of each unique case dictate how weighty and relevant each statutory factor is in the context of the case. <u>See In re Audrey S.</u>, 182 S.W.3d at 878. Simply put, the best interests analysis is and must remain a factually intensive undertaking, so as to ensure that every parent receives individualized consideration before fundamental parental rights are terminated. <u>In re Carrington H.</u>, 483 S.W.3d at 523. "[D]epending upon the circumstances of a particular child and a particular parent, the consideration of one factor may very well dictate the outcome of the analysis." <u>In re Audrey S.</u>, 182 S.W.3d at 878 (citing <u>White v. Moody</u>, 171 S.W.3d at 194). But this does not mean that a court is relieved of the obligation of considering all the factors and all the proof. Even if the circumstances of a particular case ultimately result in the court ascribing more weight—even outcome determinative weight—to a particular statutory factor, the court must consider all of the statutory factors, as well as any other relevant proof any party offers.

*In re Gabriella D.*, 531 S.W.3d 662, 681-82 (Tenn. 2017).

In the instant action, the trial court concluded that the statutory factors weighed against maintaining Father's parental rights to the Child. In its final order addressing both petitions, the trial court specifically found as follows:

Pursuant to T.C.A. § 36-1-113(i)(1), the Court finds that [Father] has not made an adjustment of circumstances, conduct or conditions as to make it safe and in the child's best interest to be in the home of [Father].

Pursuant to T.C.A. § 36-1-113(i)(2), the Court finds that there was not any evidence or testimony concerning whether [Father] made any lasting adjustments after reasonable efforts by available social services, and accordingly, finds he has not;

Pursuant to T.C.A. § 36-1-113(i)(3), the Court finds [Father], despite having liberal visitation privileges, has not maintained regular visitation or other contact with the child;

Pursuant to T.C.A. § 36-1-113(i)(4), the Court finds that [Father] has not taken significant actions that have otherwise established a meaningful relationship between himself and the child;

Pursuant to T.C.A. § 36-1-113(i)(5), the Court finds that a change of caretakers and physical environment would have a negative impact on the child's emotional and psychological condition and well-being. The child has bonded strongly with [Petitioners] and a change would adversely affect her.

Pursuant to T.C.A. § 36-1-113(i)(6), the Court finds that, although the Court has concerns about [Father's] judgment in having sexual relations with the birthmother when she was seventeen (17) years old, there is no evidence that [Father] has shown brutality, physical, sexual, emotional or psychological abuse or neglect toward the child or adult in his family or household;

Pursuant to T.C.A. § 36-1-113(i)(7), the Court finds that there is no evidence to indicate that [Father's] home with his mother is not healthy and safe or that [Father's] use of alcohol, controlled substance, or controlled substance analogue[s] would render him unable to care for the child in a safe and stable manner;

Pursuant to T.C.A. § 36-1-113(i)(8), the Court finds that [Father's] mental and emotional status would be detrimental to the child and prevent him from effectively providing safe and stable care and supervision for the child;

Pursuant to T.C.A. § 36-1-113(i)(9), the Court finds that [Father] has not paid child support consistent with the child support guidelines promulgated by the Department of [Human] Services.

(Paragraph lettering omitted.)

The trial court also elaborated on several of these statutory factors in its memorandum opinion related to best interest, which was incorporated into the final order. In its memorandum opinion, the trial court ultimately concluded that Father "perhaps

would be a better uncle than a father and a caretaker on a full-time basis for this child." The trial court further summarized:

> [Father] does what he has to do as any good uncle would do: when you come by, you see the child, you have an opportunity to visit; you come in, you visit, you play with the child, and then you go away, leaving that child to be cared for, whether that's housing, food, clothing, whatever it may be, all the needs of a child have to be met by the parent and not by the uncle.

Upon careful review, we agree with the trial court's determination that termination of Father's parental rights was in the Child's best interest.

The trial court expressly found that seven of the nine delineated best interest factors weighed against maintaining Father's parental rights to the Child. As to the remaining two, the trial court essentially found these to be neutral, weighing them neither for nor against maintaining Father's parental rights to the Child. The court noted concerning factor six that no evidence had been presented to demonstrate that Father had shown abuse or neglect toward the Child or anyone else, although the court did question Father's judgment in having sexual relations with Mother when she was underage. Additionally, the trial court found as to factor seven that no evidence had been presented to demonstrate that the home Father shared with Paternal Grandmother was unsafe or that Father's use of alcohol or controlled substances would render him unable to care for the Child. The record supports the trial court's findings concerning these factors. However, this Court has previously held, in pertinent part, that "[i]n the absence of evidence that tied" the parent to "abuse" or "an unsafe home," "we must conclude that these factors weigh against termination." *In re Braelyn S.*, No. E2020-00043-COA-R3-PT, 2020 WL 4200088, at *20 (Tenn. Ct. App. July 22, 2020), *perm. app. denied* (Tenn. Dec. 10, 2020); *see also In re London B.*, 2020 WL 1867364, at *11-12. We therefore determine that factors six and seven, rather than being neutral factors, weigh in favor of maintaining Father's parental rights to the Child.

On appeal, Father contends that the trial court erred in its consideration of the seven best interest factors that the court found weighed against maintaining his parental rights to the Child. As to factor one, Father argues that the trial court erred in finding that any adjustment of circumstance, conduct, or conditions was needed to make it safe and in the Child's best interest to be in his home. In its memorandum opinion, the trial court found as to this factor that when the instant proceedings began in 2017, Father "was not gainfully employed," although the court also found "[t]here was testimony throughout that he did odd jobs, that he may or may not have been involved in music." The court then concluded as to this ground that "[t]here have been no other adjustments that this Court can find with regard to [Father] being in a position where it would be safe and in

the best interest of this child for this child to live with him." The trial court essentially found that Father's situation had remained the same and that he had not made any adjustment of circumstance, conduct, or conditions to better prepare him to care for the Child in his home. We recognize that inasmuch as Father never had custody of the Child, she had never been removed from his home. Neither had Father ever been directed by the trial court or any other entity to accomplish certain tasks in order to demonstrate that his physical home was safe for the Child. However, having determined that the trial court did not err in finding that Father lacked the ability to assume legal and physical custody of the Child, we further determine that to the extent the trial court applied this factor to find that Father had not adjusted his circumstances so as to acquire that ability, the evidence does not preponderate against the trial court's finding regarding factor one.

As to factor two, the trial court appears to have weighed this factor against maintaining Father's parental rights on the basis that, as the court stated in its memorandum opinion, "[t]here . . . was no testimony with regard to any reasonable efforts being required or being requested from any agency so that [Father] could have the opportunity to do things any different." Factor two is applicable to cases in which a social service agency, such as the Department of Children's Services, is involved in providing reasonable efforts to a parent in an effort to effect a lasting adjustment in the parent's life. *See In re Jude M.*, 619 S.W.3d at 247 (determining that factor two was inapplicable to the best interest analysis because "neither the Department of Children's Services nor any other social services agency was involved in this action"). Although Hannah's Hope is a licensed child-placement agency, it is not a social services agency tasked with providing reasonable efforts to a parent seeking reunification with a child. We therefore determine that this statutory factor is inapplicable in this case and does not weigh for or against maintaining Father's parental rights.

Concerning factor three, Father argues, as he did in response to the statutory grounds involving visitation, that the trial court should not have weighed this factor against maintaining his parental rights because his ability to visit the Child was obstructed by others. Having previously determined that Father's visitation with the Child was not prevented by Mother or Petitioners, we find this argument unavailing. Moreover, the trial court found in its memorandum opinion regarding the quality of Father's visits with the Child:

> There was visitation, but for the most part, the visitation occurred post the four-month window. [Father] was fully given an opportunity to have a consistent relationship with this child once this matter reached Chancery Court, and the Chancery Court gave him the opportunity to visit. Testimony throughout the trial was that even that was inconsistent, and I think in closing arguments, it was [Petitioners' counsel] that made the

statistical determinations as to the number of visits that were actually made by [Father] during the period of time that he was allowed visits. And there have been these fights, in this Court even, regarding visitation.

[Father] puts up a good fight. He makes a good argument. He says the right things when it comes to his desire to visit with this child, but he does not follow up.

I think the statistics show that he visits about 63 percent of the time that he was allowed to have his visits. Testimony showed there were some points in times in which he had some excuse for why he did not visit. Court finds that those excuses were not credible and were not the kinds of things that would lend them[selves] to justifying a person who wants to develop and have time with his child to go away and do something different.

The Court has intervened on a couple of occasions and allowed him to make up time that was missed, to give him an opportunity to show to this Court, even after that four-month window, even during that period of time that the law says that they can make a change and turn things around. Court has not been convinced that [Father] has turned things around. He will fight to visit, but even on a visitation, the Court's convinced, as well, that during those periods, his visitation is more that of an uncle as opposed to a nurturing father.

I know that this is not an optimal situation for visitation. I know that it's not under the best circumstances, and we do the best we can. But if our heart is in it, I think we make the best out of that and prove to not just the individuals that are supervising the visitation but to this Court that you have a true desire to be a full-time parent. And [Father] has not shown that inclination, as far as this Court is concerned.

Court finds that because there is this conflict between the guardians of this child and [Father], it does create a situation that's just not optimal, and I don't know that you can really get around that because the visitation was set up as is allowed by the law. And the Court feels that it pressured and forced the visitation when it perhaps should have cut it off early but allowed it in the hopes that there may be some meaningful change. Finds that there was not.

- 55 -

The trial court thereby found in its memorandum opinion that Father had maintained some visitation with the Child but that Father had missed a significant percentage of his visitation time and had not utilized visitation fully to establish a meaningful bond with the Child. This was a more nuanced finding than the conclusion of law stated in the final order regarding this factor that Father had "not maintained regular visitation or other contact with the child." We determine that the evidence does not preponderate against a finding that Father's visitation with the Child, although maintained to some extent between February 2018 and the close of trial, was not regular and did not lead to the establishment of a meaningful relationship with the Child.

Regarding factor four, Father asserts that the trial court erred in finding that he had not established a meaningful bond with the Child because he had "established a bond," she "refer[red] to him as 'Daddy,'" and "undue strain" had been placed on the parent-child relationship by others "thwarting attempts by [Father] to maintain a meaningful relationship and contact with his child." Concerning this factor, the trial court found in its memorandum opinion:

> Whether or not there's this meaningful relationship between the child and [Father], recognizing again, and I'm looking at the fact that this is not the most optimal environment to try and establish a relationship between a parent and a child, the Court hasn't found that there is any meaningful relationship as one would say is dad-and-[child] but it's more of a best case scenario would be of that of an uncle who visits, drops off a couple of gifts, gives the child a hug and a kiss and is gone. During the visitation the testimony was with regard to the use of videos, the use of other kinds of things to entertain the child, and it's a young child, I know you have to do the best you can, but when it came to what a parent ought to be doing with regard to nurturing a child, there appeared to be no testimony that would show [Father] either understood that concept or was able to practice it.

As explored more fully in the section of this Opinion concerning the statutory ground of the risk of substantial harm to the Child, testimony presented by Reverend Morrison and Ms. Prince, which the trial court found to be credible, demonstrated that the Child's relationship with Father was closer to that of a child with an occasional playmate than with a father. Emphasizing that we defer to the trial court's credibility determinations, *see Jones*, 92 S.W.3d at 838, we conclude that the evidence does not preponderate against the trial court's finding that Father had failed to establish a meaningful bond with the Child.

As to factor five, Father argues that the trial court erred in finding that a change in custody and caretakers would have a detrimental impact on the Child's emotional and psychological wellbeing because the witnesses relied on by the trial court for this finding were not disinterested parties. Father offers no authority in support of this argument, and again, we find no reason to disturb the trial court's credibility determinations concerning Reverend Morrison, Ms. Prince, and Katherine B. The trial court concluded regarding this factor in its memorandum opinion:

> This child appears to be fully integrated into [Petitioners'] home, has a relationship with the other children there in the home. They consider that they are siblings, and the Court's not going to disturb that relationship and [doesn't] believe that there would be a basis for changing the child into another environment where Court doesn't feel that the particular parent is ready to be a full-time parent.

Having previously determined within our analysis of the statutory ground provided in Tennessee Code Annotated § 36-1-113(g)(9)(A)(v) that the trial court did not err in finding that the Child was in danger of substantial psychological harm if placed in Father's legal and physical custody, we further determine that the evidence does not preponderate against the trial court's finding as to this factor.

Concerning factor eight, Father posits that the trial court erred in finding that any evidence demonstrated that his mental or emotional status would be detrimental to the Child or prevent him from providing safe and stable care. In support of his position, Father notes his and Paternal Grandmother's respective testimonies that he had cared for one of his sons while that child was an infant and for another of his minor children during one summer prior to trial. In its memorandum opinion, the trial court specifically found regarding this factor:

> Whether the parent['s] mental, emotional status would be detrimental to the child or prevent him from effectively providing safe and stable care and supervision for the child. That does cause me concern, as I have indicated. [Father] just does not appear to be in a position where he can be a full-time, nurturing parent. I know that he does, in fact, get [an] SSI check.

> I asked or expected to hear, I listened to see what the true basis for his disability is. Talked about having some difficulty with reading. I don't believe that that would be the diagnosis or the basis for an SSI check. I'm not sure exactly what's what.

But I don't see or hear anything that tells the Court that [Father] has ever been required to be the adult in the room when it comes to the nurturing and the rearing of children. So I didn't find that emotionally he was ready or in a position that he could take this on on a full-time basis, and the Court did not believe that he could provide the necessary care, nurturing, or rearing, education, that would be required to ensure that this child lives life as a happy, well-adjusted and well-cared for young person.

The trial court thereby found that Father's mental or emotional status was not such that he had exhibited sufficient maturity, despite his age, to assume the role of a full-time parent and provide safe and stable care and supervision for the Child. Considering the record as a whole and particularly Father's varying statements and testimony that he had fathered five, six, seven, eight, or nine children, as well as the fact that he had obtained legal custody of none of these children, we determine that the evidence does not preponderate against the trial court's findings as to this factor.

Finally, regarding factor nine, Father asserts that the trial court erred in finding that Father had not paid child support consistent with the child support guidelines, reiterating that he had paid some support to Hannah's Hope for the Child through money orders and that he had provided some items for the Child. In concluding that this factor weighed against maintaining Father's parental rights, the trial court stated in its memorandum opinion in pertinent part:

[W]ith there being no proof of any other income, all of the conversation being dubious with regard to any real proof as to earnings by [Father] and the fact that the Court understands if his only source of income is SSI, I don't believe that there would be in place an order that he's required to pay child support of any particular dollar amount. But the law does require that they support their children in accordance to what it is they're able to do. Testimony in that regard was that [Father], when asked the question, said that he felt like a good amount to pay for child support would be $140 a month, and that was based upon the needs of the child.

Well, [Father] has not consistently paid $140 a month to support this child, and the amounts that he has paid, the Court found, were token amounts. There is just no consistency.

Father provided one $27 money order to Hannah's Hope for the Child's support during the Second Determinative Period. However, from June 2018 through August 2019, Father provided a total of $625 in additional money orders for the support of the Child as well as frequently supplying small items and gifts for the Child during visitation.

- 58 -

As we have noted in an earlier section of this Opinion, given Father's financial means, particularly his at least substantial dependence on SSI benefits, the payments he made to Hannah's Hope subsequent to the Second Determinative Period, together with the various items he provided for the Child, may well have approximated reasonable support payments. We do not agree with the trial court's finding that these later support payments were only token in nature. *See* Tenn. Code Ann. § 36-1-102 (1)(B). We determine that, considering Father's failure to support the Child during the Prenatal, First, and Second Determinative Periods, coupled with his subsequent attempts to provide support for the Child, factor nine ultimately weighs neither for nor against maintaining Father's parental rights to the Child.

In sum, we affirm the trial court's findings that factors one, three, four, five, and eight weigh against maintaining Father's parental rights to the Child. We determine, however, that although the trial court properly found a lack of evidence as to factors six and seven, the trial court committed harmless error in declining to weigh these factors in favor of maintaining Father's parental rights to the Child. We also determine that insofar as the trial court found factor two to be applicable to this matter, such a finding constituted harmless error. We further determine that the trial court erred in finding that factor nine weighed against maintaining Father's parental rights, finding that given his child support payments made subsequent to the various determinative periods and his means, this factor should be considered neutral. However, we conclude that the trial court's finding concerning factor nine represented harmless error as well because overall the best interest analysis weighs against maintaining Father's parental rights to the Child. We note especially the importance in this case of Father's lack of readiness to assume custody of the Child, the lack of meaningful relationship between Father and the Child, and the deleterious effect a change of caretakers and physical environment would likely have on the Child's emotional and psychological condition. *See In re Gabriella D.*, 531 S.W.3d at 682 (holding that a trial court "must consider all of the statutory factors" while also explaining that "the circumstances of a particular case" may "ultimately result in the court ascribing more weight—even outcome determinative weight—to a particular statutory factor").

Based on our thorough review of the evidence in light of the statutory factors, we conclude that the evidence presented does not preponderate against the trial court's determination by clear and convincing evidence that termination of Father's parental rights was in the best interest of the Child. Having also determined that statutory grounds for termination were established, we affirm the trial court's termination of Father's parental rights to the Child.

## VI. Conclusion

For the foregoing reasons, we reverse the trial court's findings regarding the statutory grounds provided in Tennessee Code Annotated § 36-1-113(g)(9)(A)(ii) and (iii). We affirm the trial court's judgment in all other respects, including the termination of Father's parental rights to the Child. This case is remanded to the trial court, pursuant to applicable law, for enforcement of the trial court's judgment terminating Father's parental rights to the Child and collection of costs assessed below. Costs on appeal are assessed to the appellant, Christopher A., Sr.

s/ Thomas R. Frierson, II_____
THOMAS R. FRIERSON, II, JUDGE